Gregory D. Miller
Gene Y. Kang
**RIVKIN RADLER LLP**
25 Main Street, Suite 501
Court Plaza North
Hackensack, NJ 07601-7082
Telephone: (201) 287-2460
Facsimile: (201) 489-0495

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| TEVA BRANDED PHARMACEUTICAL PRODUCTS R&D, INC., AND NORTON (WATERFORD) LTD., <br><br> PLAINTIFFS, <br><br> V. <br><br> CIPLA LTD, AUROBINDO PHARMA LTD., AUROBINDO PHARMA USA, INC., and AUROLIFE PHARMA LLC, DEFENDANTS | Consolidated Civil Action No. 2:20-CV-10172-JXN-MAH |

## DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF

## TABLE OF CONTENTS

**Page No.**

I.    INTRODUCTION ................................................................................ 1

II.   ANALYSIS OF THE CLAIM TERMS IN DISPUTE ................................ 2

    A.    "actuation member" ........................................................... 2

    B.    "[lying or lie] in a common plane coincident with the longitudinal
           axis X" ............................................................................ 4

    C.    "canister fire sequence" / "first reset position" / "canister fire
           configuration" / "count configuration" ................................ 9

          1.    "Canister Fire Sequence" .................................... 11

          2.    "Start Configuration" ......................................... 11

          3.    "First Reset Position"/ "Canister Fire Configuration"/ "Count
              Configuration" .................................................. 12

    D.    "datum plane which passes through a shoulder of a valve stem block
           configured to receive the medicament canister" ........................... 13

    E.    "counter display arranged to indicate dosage information" ........... 16

    F.    "first station" / "second station" .......................................... 18

    G.    "separate counter chamber" / "dose counter chamber" ............... 20

    H.    "the body" ...................................................................... 21

    I.    "different sides" .............................................................. 24

    J.    "formed in the body" ........................................................ 25

    K.    "positioned at opposite ends of the inside surface of the main body to
           face each other" ............................................................. 27

    L.    "step formed thereon" ...................................................... 29

    M.    "aperture" ...................................................................... 30

    N.    "count pawl" .................................................................. 31

## TABLE OF CONTENTS
### (*Cont'd*)

**Page No.**

III.    CONCLUSION.................................................................................................. 32

# TABLE OF AUTHORITIES

**Page No(s).**

*Abbott Labs v. Sandoz, Inc.*,
  566 F.3d 1282 (Fed. Cir. 2009)........................................................................ 4

*Augme Techs., Inc. v. Yahoo! Inc.*,
  755 F.3d 1326 (Fed. Cir. 2014)...................................................................... 28

*Biogen, Inc. v. Berlex Labs., Inc.*,
  318 F.3d 1132 (Fed. Cir. 2003)........................................................................ 4

*Chef Am. Inc. v. Lamb-Weston, Inc.*,
  358 F.3d 1371 (Fed. Cir. 2004)...................................................................... 22

*Edwards Lifesciences LLC v. Cook Inc.*,
  582 F.3d 1322 (Fed. Cir. 2009)........................................................................ 3

*Festo Corp v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
  234 F.3d 558 (Fed. Cir. 2000).......................................................................... 17

*Koki Holdings Co., Ltd. v. Kyocera Senco Industrial Tools, Inc.*,
  C.A. No. 18-313-CFC, 2021 WL 1092579 (D. Del. Mar. 22, 2021)............................... 22

*Liebel–Flarsheim Co. v. Medrad, Inc.*,
  358 F.3d 898 (Fed Cir. 2004)............................................................................ 4

*Markman v. Westview Instruments, Inc.*,
  52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996)............................... 10

*Modine Mfg. Co. v. USITC*,
  75 F.3d 1545 (Fed. Cir. 1996), abrogated on other grounds by
  *Festo Corp v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
  234 F.3d 558 (Fed. Cir. 2000).......................................................................... 17

*Netword, LLC v. Centraal Corp.*,
  242 F.3d 1347 (Fed. Cir. 2001)........................................................................ 4

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ......................................... 2, 10, 12

*Retractable Techs., Inc. v. Becton, Dickinson and Co.*,
  653 F.3d 1296 (Fed. Cir. 2011)................................................................. 14, 19

# TABLE OF AUTHORITIES
### (*Cont'd*)

**Page No(s).**

*Ruckus Wireless, Inc. v. Innovative Wireless Solutions, LLC,*
   824 F.3d 999 (Fed. Cir. 2016)............................................................................... 15

*Seachange Int'l, Inc. v. C-COR, Inc.,*
   413 F.3d 1361 (Fed. Cir. 2005)............................................................................ 14

*Secure Web Conference Corp. v. Microsoft Corp.,*
   640 Fed. Appx. 910 (Fed. Cir. 2016)................................................................. 4

*Synchronoss Techs., Inc. v. Dropbox, Inc.,*
   987 F.3d 1358, 1666 (Fed. Cir. 2021)............................................................. 22

# I.     INTRODUCTION

Plaintiffs continue to assert an excessive number of clearly non-infringed and invalid claims from the five remaining patents-in-suit.  Those claims are narrowly directed to a specific dose counter design.  Nonetheless, Plaintiffs seek to expand the asserted claims to cover dose counters generally, even though the claims recite specific structural requirements.  Plaintiffs' effort to recast their "invention," through an overbroad claim construction, is most readily apparent in their complete omission of the key aspect of their dose counter—the tape—from their background discussion of the "invention" in their opening brief.  Despite the fact that tape, or structures for holding the tape, appear in **every** described embodiment in the patent specification, Plaintiffs simply ignore those embodiments.  Instead, Plaintiffs suggest their "discovery" was putting a dose counter inside the inhaler body—a suggestion flatly contradicted by the extensive prior art and prosecution history.

Further, Plaintiffs repeatedly ignore the detailed disclosure in the specification, relying heavily on the legal premise that claim construction should not be used to limit claims to a preferred embodiment.  However, this tenant of claim construction does not allow a patentee to use claim construction to encompass a completely different claim scope than what is described in the specification.  Plaintiffs' repeated refrain that the limited disclosures in the specification cannot not limit the scope of the claims begs the question:  Why are all of Plaintiffs' constructions directed to embodiments that appear **nowhere** in the specification?  The answer is simple:  Plaintiffs are attempting to construe the claims in light of the accused products, rather than the specification, claims, and prosecution history.  Plaintiffs' attempt to use claim construction to rewrite and expand their claims should be rejected.  Defendants' constructions, which maintain the appropriately narrow scope of the claims in view of the specification, prosecution history, and the crowded field of prior art at the time of the invention, should be adopted.

## II.    ANALYSIS OF THE CLAIM TERMS IN DISPUTE

### A.    "actuation member"

| Term | Defendants' Proposal | Plaintiffs' Proposal |
|---|---|---|
| "actuation member" | "pin arranged to engage with a medicament canister and effect movement causing the dose counter to record a count" | "a component of the dose counter's actuator that transmits motion from the canister to the actuator" |

Plaintiffs, in their Opening Claim Construction Brief ("Plaintiffs' Brief"), complain that Defendants seek to limit the claims to a preferred embodiment, yet Plaintiffs fail to provide any legal or factual support for Plaintiffs' own proposed construction.  Plaintiffs' attempt to broaden the scope of the term "actuation member," converting it from a specific structure to a mere "component," by relying predominantly on extrinsic dictionary definitions.  Notably, not one of the extrinsic definitions even includes the word "component."  *See* Pl's Br. at 12, fn 2.  In fact, even Plaintiffs' **own** extrinsic evidence supports that "actuation member" is a specific structure or part—or even a "pin."  *See, e.g.,* Dkt. 110-1, Ex. 8 ("a member is taken to be a single definable part, such as beam, plate, or column").  Plaintiffs' proposed construction should be rejected because it is based on dictionary definitions that are inconsistent with the intrinsic record.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1322–23 (Fed. Cir. 2005) (*en banc*) (courts may rely "on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents").

The term "actuation member" appears nine times in the specification, all in the "summary of the invention."  *See* Dkt. 109-1, Ex. 1 at 6:31-62.  The specification defines "actuation member" as "the actuation member comprising *a pin* . . . ."  *Id.* at 7:20-24.  From that point forward, the specification no longer uses "actuation member," but instead uses the definition of that term,

referring to an "actuation pin" or "pin." Notably, these terms appear twenty-eight times throughout the "Detailed Description of the Invention," evidencing the terms interchangeable use.

During prosecution, the Applicants made clear that the terms are interchangeable. The Applicants cited "the actuation member at **74**," while pointing to Figure 7D, which depicts only an "actuation pin." *See* Dkt. 109-1, Ex. 6 at 5. Moreover, the specification repeatedly refers only to an "actuation pin" or "pin" at "aperture **74**". *See* Dkt. 109-1, Ex. 1 at 12:47-49 ("The pin **34** . . . extends through an aperture **74**"), 12:38-42 ("[t]he dose counter **36** includes an actuation pin **34**"); *see also id.* at 12:50-53, 13:44-45, 14:7-8, 14:11, 14:40-42, 14:67-15:3, 15:47-52, 16:9-13. Where the specification consistently uses words interchangeably, the interchangeable use of the terms "is akin to a definition equating the two." *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1329 (Fed. Cir. 2009). Thus, the intrinsic record makes clear that "actuation member" is equated to "actuation pin" or simply "pin."

Not only does the specification define "actuation member" as "pin," at least by repeatedly equating the two structures, but the claims also require that "actuation member" mean "pin." In order to obtain allowance of the claims, Plaintiffs highlighted a particular problem that their patent purported to solve—that rocking of the canister would cause the "actuation member" to move, resulting in unwanted dose counting. *See* Dkt. 109-1, Ex. 6 at 5; Dkt. 109-1, Ex. 7 at 2-3. When the "actuation member" is a pin, this problem persists and must be addressed. However, if, as Plaintiffs now propose, the claim is rewritten to encompass "a component of the dose counter's actuator that transmits motion," the problem ceases to exist because movement of "a component" may not actually move the entire structure sufficiently to cause a dose count. The claims, therefore, require that the "actuation member" be an entire structure, not merely a "component" of a structure,

and the structure as defined by the specification is a "pin." Thus, Plaintiffs' reliance on dictionary definitions inconsistent with the intrinsic record is misplaced and should be rejected.

Lacking support for their proposed construction, Plaintiffs instead argue that Defendants are improperly narrowing the claim term to a preferred embodiment. Plaintiffs are wrong. The claims cannot "enlarge what is patented beyond what the inventor has described as the invention." *Biogen, Inc. v. Berlex Labs., Inc.,* 318 F.3d 1132, 1140 (Fed. Cir. 2003) (quoting *Netword, LLC v. Centraal Corp.,* 242 F.3d 1347, 1352 (Fed. Cir. 2001)). Thus, a court may adopt "a narrower construction, limited to the embodiment(s) disclosed in the specification, when the claims themselves, the specification, or the prosecution history clearly indicate that the invention encompasses no more than that confined structure or method." *Abbott Labs v. Sandoz, Inc.*, 566 F.3d 1282, 1288 (Fed. Cir. 2009) (citing *Liebel–Flarsheim Co. v. Medrad, Inc.,* 358 F.3d 898, 908 (Fed Cir. 2004)). The claims, specification, and prosecution history clearly indicate that the "actuation member" encompasses no more than the disclosed structure—a "pin."

Defendants' proposed construction is the only one consistent with the claims, specification, and prosecution history. *See Secure Web Conference Corp. v. Microsoft Corp.*, 640 Fed. Appx. 910, 914 (Fed. Cir. 2016). For all these reasons, and the reasons set forth in Defendants' Opening Brief, the Court should adopt Defendants' proposed construction.

**B.** **"[lying or lie] in a common plane coincident with the longitudinal axis X"**

| Term | Defendants' Proposal | Plaintiffs' Proposal |
|---|---|---|
| "[lying or lie] in a common plane coincident with the longitudinal axis X" | "aligned in a single plane such that a straight line can be drawn through the center of the central outlet port, a canister support formation located directly adjacent to the actuation member, and the actuation member" | "Features lie on a common plain coincident with the longitudinal axis X if it is possible to draw a straight line connecting those features that passes through the center of the stem block" |

The parties' dispute lies in whether the canister support formation must be located directly adjacent to the actuation member, and Plaintiffs' own arguments confirm that it must.

In an attempt to illustrate the parties' dispute, Plaintiffs include an image with a blue circle representing the inhaler body, a "donut hole" in the middle representing the central outlet port, and a red rectangle representing an inner wall canister support formation. *See* Pl's Br. at 17-18. The image includes three potential actuation member locations identified as blue, yellow, and pink triangles. *Id*. Under Plaintiffs' construction, any of these triangles would satisfy the limitation because each triangle is aligned with the central outlet port and inner canister support formation, as shown by the green line. *Id*. However, if rocking is in the direction of the yellow or pink actuation members (shown with the orange arrow), nothing prevents unwanted actuation. To the contrary, when the rocking is in the direction of the light blue actuation member (shown with the purple arrow), which is directly adjacent to the canister support formation, unwanted actuation may be prevented.



Pl's Br. at 18 (orange and purple arrows added). Plaintiffs' construction simply ignores the Applicant's arguments in favor of patentability:

> . . . [T]he claimed arrangement has the advantage of **preventing the canister from rocking towards the position of the dose counter actuation member**, which rocking can change the height of the actuation member and thereby undesirably alter the accuracy of the dose counter. . . .

> Applicant has discovered that by minimizing and/or eliminating the described rocking of the canister **in the direction of the actuation member**, by way of the **specific positioning of a canister support formation relative to the actuator** and outlet port, the present invention improves accuracy of such dose counters. Neither the problem of canister rocking, nor the solution of **specific placement of the canister support formation** are taught or suggestion by the prior art. . . .

Dkt. 109-1, Ex. 6 at 5-6 (emphases added). The Examiner also highlighted this argument, explaining that "[t]he examiner **is persuaded** that rocking by the canister about its central axis **in the direction of the actuation member** could risk triggering false counting, and that a **canister support formation directly in line with the actuation member** and the central canister axis **could prevent rocking in this direction** and thus reduce false counts." *See* Dkt. 109-1, Ex. 7 at 3 (emphases added). Plaintiffs' construction, which entirely ignores the purpose of the arrangement, cannot be correct.

Plaintiffs argue that claim differentiation supports their construction. It does not. Plaintiffs rely on a **portion** of claim 9, which recites, "wherein the support rail merges with the inner wall at a location adjacent the aperture." However, Plaintiffs ignore that claim 9 depends from **both** claim 4 and claim 1. *See* Dkt. 109-1, Ex. 1 at claims 1, 4, and 9. Claim 4 requires that the support rail "extend[] longitudinally along an inside surface of the main body," then claim 9 further narrows this claim to require that the support rail "merge[] with the inner wall" at a particular point (adjacent to the aperture through which the actuation member extends). *See id*. Even if the support rail is required to be directly adjacent to the actuation member in claim 1, claim 4 narrows claim 1 by requiring that support rail to extend longitudinally, and claim 9 further narrows these claims by requiring the support rail to merge with the inner wall at a particular point. *See id*. The inner wall support and actuation member can be directly adjacent (as required by claim 1), without the support rail "extending longitudinally along an inside surface of the main body" or "merging with the inner wall," as required by claims 4 and 9, respectively.

Plaintiffs next turn to the specification, complaining that "precisely two passages discuss a canister support formation being adjacent to anything." Plaintiffs' argument ignores several key points. First, "the precisely two passages" are **two of precisely three** passages in the specification describing of the arrangement of the support formations in relation to the actuation member. *See e.g.*, *id.* at 6:34-43 ("a first inner wall canister support formation located directly adjacent the actuation member"); 15:33-36 ("As shown in FIGS. 7C and 7D, the inner wall **50** of the main body **10** is provided with a two-step support rail **144** which extends longitudinally along inside the main body and **is located directly adjacent the aperture**."). The third passage, without using the words "directly adjacent," describes the arrangement as aligned **and** directly adjacent. *See id.* at 6:50-63 ("the inner wall canister support formation, the actuation member and the outlet port lying in a common plane . . . . Accordingly, this construction may prevent the canister from rocking towards the position of the dose counter actuation member.").

Second, every single figure depicting the first canister support formation and the actuation member shows them to be "directly adjacent." *See id.* at Figs. 2, 7A, 7B, 7C, 7D, 10A, and 10B. Notably, Plaintiffs have not identified **a single passage or figure** in which the first canister support formation is not "directly adjacent" the actuation member. *See* Pls' Br. at 16-20.

Finally, in their rush to place a "nail in Defendants' claim construction coffin," Plaintiffs cherry pick an amendment from an office action response, ignoring both the Applicants' supporting argument and the context leading to the amendment. By ignoring the Applicants' reasoning for the amendment and for allowance in view of the amendment, Plaintiffs misrepresent the import of the amendment. The Applicants initially amended the claims to recite "a first inner wall canister support formation extending inwardly from a main surface of the inner wall and located directly adjacent the actuation member." '289 Patent Prosecution History, Nov. 4, 2015

Office Action Response at 2 (Ex. 16).[1]  In response, the Examiner issued a final rejection, and explained that "variation in the shape of canister support formations, and how close these support formations are to an actuation member are not important functional differences."  '289 Patent Prosecution History, Dec. 7, 2015 Office Action at 2 (Ex. 17).  As written, the amended claim did not require alignment; it was later amended to require alignment.  Thus, using Plaintiffs' image (below), the added black triangle could have satisfied the "adjacent" limitation as originally amended, but not served the functional purpose of preventing unwanted actuation, resulting in the Examiner's rejection.



Pl's Br. at 18 (black triangle and purple arrow added).

In response to the Examiner's rejection, the Applicants amended the claims to require alignment and highlighted the inventive function of this alignment as preventing unwanted actuation caused by rocking **in the direction of the actuation member**.  Dkt. 109-1, Ex. 6 at 5-6. As explained above, the amendment and argument, together, necessitate that the actuation member be both in recited alignment **and** directly adjacent to the canister support formation.  *See id*. at 6 ("Applicant has discovered that by minimizing and/or eliminating the described **rocking of the**

---

[1] Exhibits 16-20 are attached to the Second Declaration of Karen M. Cassidy.

**canister in the direction of the actuation member,** by way of the **specific positioning of the canister support formation relative to the actuator** and outlet port, the present invention improves the accuracy of such dose counters.") (emphases added).

Plaintiffs' proposed construction ignores the arguments made by the Applicants during prosecution and ignores the problem allegedly solved by the patent, as well as the inventive solution—effectively erasing the actual claimed invention:  an arrangement that prevents rocking towards the actuation member to improve accuracy of dose counters.  Defendants do not ask the Court to rewrite the claims, but rather to construe them consistently with the specification, the figures, and the prosecution history, including both the Applicant's own arguments and the Examiner's reasons for allowance.  For all these reasons, as well as the reasons set forth in Defendants' Opening Brief, the Court should adopt Defendants' proposed construction.

**C.**    **"canister fire sequence" / "first reset position" / "canister fire configuration" / "count configuration"**

| Term | Defendants' Proposal | Plaintiffs' Proposal |
|---|---|---|
| "canister fire sequence" | "process of ejecting medicament from an inhaler where the actuator pawl follows a particular sequence of movement from the start configuration to the reset configuration, to the fire configuration, to the count configuration, before returning to the start configuration upon release of pressure on the canister, where in the start configuration, prior to depression of the canister, the count pawl is engaged with a tooth of the ratchet wheel and the actuator pawl is spaced from the ratchet wheel" | "a sequence of configurations and positions that occur before, while, and after the medicament canister fires medicament" |
| "first reset position" | "configuration in which the actuator pawl is above the datum plane, but closer to the datum plane than in the start configuration, and is just engaged with one of a tooth of the ratchet wheel" | "a position of the actuator in which the actuator pawl is brought into engagement with the first tooth of the ratchet wheel and which is before the fire configuration" |
| "canister fire configuration" | "configuration in which the actuator pawl is lower than in the first reset position and below the datum plane and the medicament is ejected" | "a configuration of the dose counter in which the medicament |

| | | canister fires medicament" |
|---|---|---|
| "count configuration" | "configuration in which the actuator pawl is further below the datum plane than when in the canister fire position and the dose counter has counted one dose" | "a configuration of the dose counter whereby the dosage indicator has indicated a count" |

Plaintiffs' argument once again relies primarily on the premise that preferred embodiments should not be read into the claims, while ignoring the fundamental requirement that claims must still be construed in light of the specification and prosecution history. Indeed, the specification is "the single best guide to the meaning of a disputed term" and "[u]sually, it is dispositive." *Phillips,* 415 F.3d at 1313 (internal citation omitted). Thus, "claims 'must be read in view of the specification, of which they are a part.'" *Id.* at 1315 (quoting *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd,* 517 U.S. 370 (1996)).

The specification describes the canister fire sequence in great detail, dedicating nearly two full columns to this disclosure. *See* Dkt. 109-1, Ex. 1 at 13:40-15:31. This extensive disclosure makes clear that the sequence happens **in a specific order** and in general locations relative to the datum plane and the preceding configuration. *Id.*

Not only does the specification highlight the importance of the canister fire sequence, and the arrangement of the configurations, but the Applicants also highlighted it repeatedly during prosecution. For example, the Applicants argued that prior art reference "Bowman may not have appreciated the importance of the count sequence of the present invention because . . . Bowman uses a . . . continuous, rather than step-wise, restriction on reverse rotation." Dkt. 109-1, Ex. 15 at 8. Applicants repeatedly distinguished the prior art based on the canister fire sequence. *See id.*, '156 Patent Prosecution History, February 21, 2017 Office Action Response at 7-8 (Ex. 18), Dkt. 109-1, Ex. 11 at 7-8, '156 Patent Prosecution History, August 22, 2017 Office Action Response at 8 (Ex. 19). The sequence must happen in a particular order as the actuator pawl is depressed by

the canister during use, and this also necessarily requires the configurations to occur in general locations relative to each other and a reference point (here the datum plane). *See e.g., Dkt.* 109-1, Ex. 1 at 13:40-15:13 (describing the various configurations relative to each other and a datum plane); 17:25-30 (determining the average positions of the start, reset, fire, and count positions relative to the datum plane).

1. **"Canister Fire Sequence"**

Plaintiffs ignore the detailed disclosure in the specification, the importance of the fire sequence, and the configuration of positions within that sequence, in favor of generalized "constructions," divorced from the context provided by the intrinsic record. Plaintiffs' construction also entirely ignores that the sequence must occur in a particular order.

2. **"Start Configuration"**

Plaintiffs complain that Defendants' construction improperly imports a "start position" into the claim. However, a start position is inherent to any sequence or series of configurations because the sequence must begin somewhere. More particularly, Plaintiffs complain that Defendants' construction requires the count pawl to be engaged with a tooth of the ratchet wheel, but that is simply how the specification describes the "start configuration." *See id*. at 14:9-39. This is necessary because this configuration provides the "restriction on reverse rotation," which the Applicants highlighted during prosecution. Dkt. 109-1, Ex. 15 at 8; *see also* Dkt. 109-1, Ex. 1 at 15:41-42 ("the chassis **102** is provided with an anti-back drive tooth **138** or count pawl **138**"). Plaintiffs also complain that Defendants' construction defines a return to the "start configuration" after pressure on the canister is released. Yet again, this is an inherent part of the sequence as the canister is released after firing, and the inhaler returns to its "rest" or "start position" in order for the user to be able to fire it again for the next dose. Thus, Defendants' construction is correct.

3.    **<u>"First Reset Position"/ "Canister Fire Configuration"/ "Count Configuration"</u>**

Plaintiffs dispute Defendants' inclusion of relative locations in their proposed constructions, particularly that in the "first rest position" the actuator pawl should be above the datum plane, but closer to the plane than in the start configuration; that in the "canister fire configuration" the actuator pawl should be lower than in the first reset position; and that in the count configuration the actuator pawl should be further below the datum plane than when in the canister fire configuration.  Contrary to Plaintiffs' arguments, these relative locations are key—roughly 10% of the specification is dedicated to describing these relative positions.  *See*, e.g., Dkt. 109-1, Ex. 1 at 13:40-15:32.  The mere fact that dependent claims narrowly specify **absolute** distances does not change the fact that the **relative** positions are key aspects of the claimed configurations.

Contrary to Plaintiffs' arguments, Defendants are not "reading in" embodiments.  The extensive disclosure in the specification serves to **define** the claimed positions.  *See Phillips,* 415 F.3d at 1313.  For example, the specification explains that Fig. 10C shows a particular configuration, in which the actuator pawl is above the datum plane, but closer to the datum plane than in the start configuration.  *See* Dkt. 109-1, Ex. 1 at 14:40-46.  The specification states that "[t]his is referred to as a 'reset' position or configuration."  *Id*. at 14:45-46.  The specification similarly states that "[t]he configuration shown in Fig. 10D is known as a 'Fire' configuration," and describes the actuator pawl as below the datum plane (necessarily lower than the first reset position).  *Id*. at 14:56-59.  Finally, the specification states that "Fig. 10E shows a further step in the sequence, called a 'Count' position," *id*. at 14:60-61, and explains that "in this position, the actuator **80** generally, is . . . lower than in the fire configuration."  *Id*. at 15:5-6.  The description in the specification may be long, but it is still plainly **defining** the configurations.

Plaintiffs' constructions ignore these clear definitions—definitions that a person of skill in the art would have adopted upon reviewing the specification to understand the various configurations in claim 1 and how to identify those configurations—and should be rejected.

## D.    "datum plane which passes through a shoulder of a valve stem block configured to receive the medicament canister"

| Term | Defendants' Proposal | Plaintiffs' Proposal |
|---|---|---|
| "datum plane which passes through a shoulder of a valve stem block configured to receive the medicament canister" | "plane or line passing through the bottom surface of a structure into which the valve stem of a medicament canister is inserted, wherein the bottom surface is where the valve stem block meets a passageway to a nozzle for directing the canister contents towards an air outlet" | "a plane that passes through a shoulder of the portion of the inhaler body that engages the valve stem and is perpendicular to the direction of movement of the medicament canister" |

Plaintiffs admit that "[t]he datum plane 'passes through [the] bottom surface or shoulder of [the] valve stem block.'" Dkt. 50 at 37.[2] Moreover, **the only passage in the entire patent** that describes the location of the datum plane states that it "passes through [a/the] bottom surface or shoulder **42** of valve stem block **40**." Dkt.. 109-1, Ex. 1 at 14:17-19. Thus, a shoulder is a bottom of the valve stem block. The only remaining question, a question which Plaintiffs' proposed construction leaves open, is how to identify the (or "a") "bottom surface or shoulder" of a "valve stem block." This is particularly important in view of Plaintiffs' representation that the location of a shoulder, at the bottom of the inhaler, is the novel aspect of the invention. *See* Pl's Br. at 5.

The specification makes clear where the "bottom surface or shoulder" is located—the bottom of the valve stem block is where the valve stem block meets a passageway to a nozzle for

---

[2] Plaintiffs manufacture a dispute between the parties over "a" versus "the," but there is no real dispute over the use of these terms. Plaintiffs interchangeably used "a" and "the" when referring to a/the shoulder or bottom surface, and Defendants have never taken the position that use of "the" narrowed the scope of the claim to precisely one shoulder.

directing the canister contents towards an air outlet.  *See* Dkt. 109-1, Ex. 1 at Fig. 9; Fig. 3A; 12:26-29 ("The valve stem block **40** has a passageway **42** leading to a nozzle **44** for directing the contents of the canister **20** . . . ."); Def's Br. at 24.  Plaintiffs' argument that the "shoulder" is "any portion of the 'valve stem block' that resembles a shoulder" is entirely inconsistent with both the description in the specification and figures, and Plaintiffs' claim that the point of novelty of the invention was the Applicants' recognition "that it was advantageous to place the dose counter in a lower-than-expected position, so that a particular portion of the dose counter (the 'actuator pawl') is below other components of the inhaler body (represented by a 'datum plane' that passes through a 'shoulder of a valve stem block')."  Pl's Br. at 5.

Plaintiffs again rely on claim differentiation to justify their overbroad constructions. However, "any presumption created by the doctrine of claim differentiation 'will be overcome by contrary construction dictated by the written description and prosecution history.'"  *Retractable Techs., Inc. v. Becton, Dickinson and Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011) (citing *Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1369 (Fed. Cir. 2005).  As explained above, the only use of "shoulder" in the specification equates it to "a bottom surface." Dkt. 109-1, Ex. 1 at 14:17-19. This location is confirmed by the figures in the specification.  *See id*. at Fig. 9.  Plaintiffs' arguments also confirm that the particular location (e.g., at a bottom surface) was key to patent allowance.  *See* Pl's Br. at 5.  Moreover, Plaintiffs' argument is entirely arbitrary.  Claim 13 adds two limitations, one of which is that the datum plane "is perpendicular to the direction of the movement of the medicament canister." Dkt. 109-1, Ex. 3 at claim 13.  Notably, Plaintiffs import this precise language into their own definition.  Plaintiffs provide no justification for their arbitrary

decision that half of claim 13 differentiates claim 1, while the other half should be imported into the construction.[3]

Plaintiffs' reliance on extrinsic evidence to the exclusion of the specification should be rejected. The definition of "shoulder" from extrinsic sources (e.g., dictionaries and other patents) sheds no light on how a "shoulder" should be identified in the context of the disclosure and claims of the '156 Patent. For example, Plaintiffs attempt to show that Defendants' construction does not "read on" a shoulder in a prior art patent from a different patent family with different inventors ("Castro"). Plaintiffs' analysis is irrelevant and incorrect. First, how extrinsic evidence in a **different patent** allegedly defines a "shoulder" does not provide a basis for ignoring how the specification of the patents-in-suit defines a shoulder. *See Ruckus Wireless, Inc. v. Innovative Wireless Solutions, LLC*, 824 F.3d 999, 1003 (Fed. Cir. 2016) ("Ultimately, the only meaning that matters in claim construction is the meaning in the context of the patent. Legal error arises when a court relies on extrinsic evidence that contradicts the intrinsic record." (internal quotations and citations omitted)). Second, Plaintiffs are incorrect that "shoulder 24c" is not a "shoulder" consistent with Defendants' proposed construction. In Fig. 3 of Castro, the valve stem block 24 has a structure (24c), where the valve stem block meets a passageway (26) to a nozzle for directing the canister contents towards an air outlet (30). Thus, contrary to Plaintiffs' arguments, structure 24c is "a shoulder of a valve stem block configured to receive the medicament canister" as construed by Defendants' in view of the claims and specification of the patents-in-suit.

---

[3] Defendants would not oppose the inclusion of language indicating that the plane "is perpendicular to the direction of movement of the medicament canister" in their construction. Both parties appear to recognize that claim 13 recites inherent aspects of claim 1. Rather than arbitrarily identifying one half of claim 13 as narrowing and the other half of claim 13 as inherent in claim 1, a proper construction would recognize both aspects of claim 13 as being inherent in claim 1.

For all these reasons, as well as the reasons set forth in Defendants' Opening Brief, the Court should adopt Defendants' proposed construction.

**E.** **"counter display arranged to indicate dosage information"**

| Term | Defendants' Proposal | Plaintiffs' Proposal |
|------|---------------------|---------------------|
| "counter display arranged to indicate dosage information" | "structure displaying the number of doses remaining" | "a component of the dose counter that displays information regarding the number of doses remaining" |

Plaintiffs admit that knowing the total number of doses is not merely necessary, but is critical, stating that "the consequences of believing, mistakenly, that an inhaler contains additional doses **can be dire**." Pls' Br. at 3. Nevertheless, Plaintiffs argue that "dosage information" to be displayed to the user means any information about doses, **even if it is not the total doses remaining**. During the parties' meet and confers, Plaintiffs represented that under their construction the "counter display" could be a "component" displaying only one unit of the remaining dosages. Under this incorrect construction, a "counter display" could display a single number, without indicating to the user whether that number meant there were 5, 15, 50 or 500 doses remaining. This lack of clear dosage indications, in Plaintiffs' own words, "can be dire." Plaintiffs' contradictory touting of the need for clear indications of total doses remaining while simultaneously construing the claims to allow for the display of only partial dosage information is a futile attempt to twist the plain meaning of the claim term to read on the accused products.

Plaintiffs' construction improperly broadens the scope of "counter display" to mean "component of the dose counter," thereby allowing the "counter display" to be comprised of numerous components (e.g., two tapes moving in opposite directions). Plaintiffs' proposed construction would render the claims invalid. "When claims are amenable to more than one construction, they should when reasonably possible be interpreted to preserve their validity."

*Modine Mfg. Co. v. USITC*, 75 F.3d 1545, 1557 (Fed. Cir. 1996), abrogated on other grounds by *Festo Corp v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 234 F.3d 558 (Fed. Cir. 2000).

The specification describes only a single structure, a tape, as a "counter display." As Plaintiffs argue, "designing a dose counter . . . is quite a feat of engineering, especially when considering the small portable nature of inhalers." Pl's Br. at 3. Yet the specification lacks **any disclosure** of how a multi-component display would work in the invention—would it require two actuation pawls? Would each component require its own count pawl? Would the same actuation member actuate all components? How would the simultaneous movement of the components be controlled (e.g., when moving from a display of 200 to 198, where the tens and units appear on different components)? How would the non-simultaneous movement be controlled (e.g., when moving from a display of 202 to 200, where the tens and units appear on different components)? A POSA reading the specification would have no understanding of how to make a multi-component display work in the invention, nor as Plaintiffs contend, would designing such a display be an easy task.

Plaintiffs' repeated refrain that Defendants must identify evidence of lexicography or disavowal of **Plaintiffs' purported plain meaning** ignores the basic tenant of claim construction that the plain meaning is determined in view of the claims, specification, and prosecution history. Plaintiffs' "plain meaning" is simply incorrect. Claim construction cannot be determined in a vacuum, ignoring the teachings and the clear limitations of the patent. A patentee cannot describe one particular, narrow mechanical device, and then use "plain meaning" to claim every mechanical device under the sun. Here, the patentees did not invent dose counters generally, nor did they invent the first dose counter. Rather, they obtained claims to a very specific tape-based dose counter and, purportedly, solved a very specific problem unique to dose counters containing tape-

based displays.  *See* Pl's Br. at 5 (describing the inventive aspect of the '808 patent as adding a regulator); *see* Dkt. 109-1, Ex. 1 at 4:39-50 (describing regulator as projections on a shaft, from which the display tape unwinds).  Plaintiffs cannot now use claim construction to expand their claims beyond this narrow scope.

Defendants' proposed construction is consistent with the plain meaning in view of the specification, the scope of the actual invention, and the purported purpose of the display—to inform users of the number of doses left in their inhaler.

## F.    "first station" / "second station"

| Term | Defendants' Proposal | Plaintiffs' Proposal |
|---|---|---|
| "first station" | "first structure on which the counter display is located" | "a first region" |
| "second station" | "second structure, separate from the first structure, on which the counter display is located" | "a second region" |

Plaintiffs contend that these terms have a plain meaning.  To the extent they do, that plain meaning is reflected in Defendants' proposed construction, not Plaintiffs' proposed construction.

Plaintiffs' proposed construction improperly plucks a word, "region," from the specification, while ignoring the context of the sentence.  The specification refers to the "first station" as "a region" just one time, and clearly states that "[t]he first station may comprise **a region of the dose counter where tape is held**."  Dkt. 109-1, Ex. 1 at 3:65-66 (emphasis added).  The specification then repeatedly explains that **the tape is held on a structure** (e.g., a shaft, stock bobbin, or bobbin).  *See e.g., id.* at Abstract ("the tape unwinding **from a stock bobbin** during use of the inhaler"), 2:4-5 ("[a] **stock bobbin** of the counter, **from which** the tape is unwound"),  4:38-39 ("the tape unwinding **from a stock bobbin**"), 4:39-44 ("a rotation regulator being provided for the **stock bobbin** . . . permitting incremental unwinding"), 5:36-37 ("the tape being positioned on a **tape stock bobbin** and being arranged **to unwind therefrom**), 8:55-58 ("the dose counter having a display tape arranged to be incrementally driven **from a tape stock bobbin** onto an incremental tape take-up drive"), 9:60-61 ("[t]he main elongate tape structure may have at least one end thereof

wound on a **bobbin or shaft**”), 13:17-18 (“the tape **112** is incrementally and gradually wound **onto the tape reel shaft 106 from the second shaft**”), 16:28-29 (“[t]he tape **112** is attached at one end (not shown) to the tape stock bobbin **110** and is **wound onto the bobbin**”), 19:28-30 (“a force of 0.3 to 0.4 N needs to be applied to the tape **112** to overcome the regulator at the stock bobbin **110**”) (emphases added).  It is clear from the specification, that the “first station” is a structure on which the counter display is located.

The claims and specification similarly make clear that the second station is a separate structure.  For example, the claims require that movement be “**from a** first station **to a** second station**,**” indicating movement between stations, thereby requiring separation.  *See also id*. at 3:51-52 (“The **second shaft** may be . . . **spaced from and parallel to** the **first shaft**.”); 13:3-8 (“The dose counter . . . includes a chassis **102** having a **first shaft 104** . . . and a **second shaft** . . . which is **parallel to and spaced from** the first shaft”); 2:62-64 (“The first station  . . . is located before a display location”) (emphases added).

Plaintiffs again rely on claim differentiation based on claim 23 reciting “a second shaft which is located at the second station,” however, this ignores the extensive teachings in the specification that “stations” are structures.  Moreover, “any presumption created by the doctrine of claim differentiation ‘will be overcome by contrary construction dictated by the written description and prosecution history.’”  *See Retractable Techs.*, 653 at 1305.  Plaintiffs fail to provide any reasoning for their assumption that a particular structure (e.g., “second shaft”) cannot be located at a “second structure.”  For example, claim 24 depends from claim 23 and further narrows the “second station” or “structure” on which the “second shaft” is located to “the main body of the dose counter.”

Defendants’ proposed construction is consistent with the plain meaning in view of the specification and the scope of the actual invention, and should be adopted.

### G.  "separate counter chamber" / "dose counter chamber"

| Term | Defendants' Proposal | Plaintiffs' Proposal |
|------|---------------------|---------------------|
| "separate counter chamber" | "discrete space or cavity defined by the main surface of the inner walls and the inner wall through which a portion of the actuation member extends in which the dose counter is located" | "a separate chamber of the inhaler in which the dose counter is located" |
| "dose counter chamber" | "space or cavity defined by the main surface of the inner walls and the inner wall through which a portion of the actuation member extends in which the dose counter is located" | "a separate chamber of the inhaler in which the dose counter is located" |

Plaintiffs offer no actual constructions.  Rather, their proposed constructions import words into the phrases and leave the key terms, "separate" and "chamber" undefined, all while ignoring the specification.  Plaintiffs argue, "[t]he claim language requires only . . . that the counter chamber be located in the inhaler body, and be separate from the medicament receiving portion."  Pl's Br. at 44.  Plaintiffs' argument is premised on the erroneous belief that if a term is not explicitly defined, the specification can be completely ignored.  *Id.*  Even if Plaintiffs were correct (they are not), the specification clearly defined how the canister chamber and the dose counter chamber are separated:  "a separator wall 76 which separates the canister chamber 18 from the dose counter chamber 66."  Dkt. 109-1, Ex. 1 at 12:49-52.

The specification reveals that the dose counter chamber is defined by walls.  For example, the patentee characterizes "the present invention" as having "the dose counter being located in a dose counter chamber of the body which is separated from the main part of the body."  *Id.* at 8:33-37.  The specification makes clear how the dose counter chamber of the body is "separated" from the main part of the body – by a wall.  *See e.g.*, *id.* at 6:28-37 ("the main body of the inhaler having wall surfaces separating the canister-receiving portion and the counter chamber"); 7:20-29 ("a wall which separates the counter chamber and the canister housing").  The figures also support the requirement that a wall separate the chambers.  For example, Figures 7B-D depict the separator

wall 76, Figure 1 depicts the canister chamber 18, and Figure 8A depicts the dose counter chamber 66.  The specification provides no other structure for the two chambers to be "separated," and Plaintiffs' proposed construction fails to consider the specification and drawings.  The specification even touts this separation between the chambers as being advantageous:  "This is high [sic] advantageous since it enables the inhaler to be thoroughly washed and the dose counting chamber can thereafter dry out fully."  *Id*. at 8:38-40.

Plaintiffs' inability to offer any explanation of the meaning of the terms "separate" and "chamber" illustrates the need to define these terms structurally.  Defendants' constructions do just that, and should be adopted.

## H.    **"the body"**

| Term | Defendant's Proposal | Plaintiffs' Proposal |
|------|----------------------|----------------------|
| "the body" | Indefinite | "inhaler body" - '156 Patent, 22:64, 67<br><br>"dose counter body" - '156 Patent, 22:66 |

Plaintiffs argue that "the body" in claim 12 is not indefinite, but rather that:  (1) the second "the body" in dependent claim 12 is different from the other two references to "the body" in the claim; and (2) the second "the body" in claim 12 merely lacks antecedent basis.  Plaintiffs then contend that the lack of antecedent basis should be overlooked because a POSA would allegedly understand its meaning.  Pl's Br. at 50.  Plaintiffs are wrong.

First, Plaintiffs' focus on whether the term "the body" can be understood in the absence of antecedent basis, ignores a more fundamental problem.  A POSA may understand "the body" in claim 12 to have antecedent basis.  The term "the body" appears in claim 1 from which claim 12 ultimately depends.  There, the parties agree that "body" means "the body of the inhaler."  *See* Dkt. 102 at 4.  A POSA reading claim 12 would have no reason to scour the specification to divine

which of the many uses of "the body" therein applies to claim 12, when "body" has already clearly been articulated in claim 1.

However, when read with the antecedent basis provide by claim 1, claim 12 requires:

"[a]n inhaler as claimed in claim 11 in which [the body of the inhaler] includes a canister-receiving portion and a separate counter chamber; [the body of the inhaler], ratchet wheel and actuation being located inside the counter chamber."

Dkt. 109-1, Ex. 3 at claim 12. Claim 12, as expressly written, is nonsensical and physically impossible—the body of the inhaler cannot contain a counter chamber in which the body of the inhaler is located. "A claim that is nonsensical or requires an impossibility is indefinite as a matter of law . . . ." *Koki Holdings Co., Ltd. v. Kyocera Senco Industrial Tools, Inc.*, C.A. No. 18-313-CFC, 2021 WL 1092579, at * 1 (D. Del. Mar. 22, 2021) (citing *Synchronoss Techs., Inc. v. Dropbox, Inc.*, 987 F.3d 1358, 1666-67 (Fed. Cir. 2021). To paraphrase Plaintiffs, "the relevant question is not whether claim 12 can be rewritten to make sense to Plaintiffs' lawyers." *See* Pl's Br. at 49. To the contrary, courts "construe claims as written, not as the patentees wish they had written [them]." *Chef Am. Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004). As written, "the body," and therefore claim 12, is indefinite.

Second, Plaintiffs' attempt to avoid indefiniteness by arguing that "the body" in claim 12 means something different from "body" in claim 1, but that despite the lack of antecedent basis for this different meaning, "the body" is not indefinite, fails. Even if Plaintiffs were correct that "the body" as recited in claim 12 was different from "body" as recited in claim 1, the lack of antecedent basis would still render the claim indefinite.

Plaintiffs, without evidence, argue that a POSA would understand "the body" in the claim, and therefore the lack of antecedent basis should not render the claim indefinite. Rather, Plaintiffs' attorneys speculate as to what a POSA would understand the term to mean. Pl's Br. at 49. Within

the specification, the term "body" appears over 70 times in numerous different contexts.[4]  Yet Plaintiffs' counsel claims to intuit, without support, which of the numerous "body" meanings a POSA would select for the second use of the term "body."  In fact, the claims themselves contradict Plaintiffs' position.  Claim 12 depends from claim 11, which depends from claim 1.  Claim 1 recites the dose counter as comprising a ratchet wheel, an actuator, a count pawl and a dosage indicator – there is no indication of the existence of a dose counter body.  The only reference to the term "body" in claim 1 is in the preamble, which the parties do not dispute refers to the body of the inhaler.  Claim 11 requires an inhaler comprising "the body arranged to retain the medicament canister . . . ," clearly referring to the "inhaler body."  *See also* claims 2, 4 and 10 (each reciting "the body" with reference to the inhaler body).

Plaintiffs' representation of the "long line of precedent" with respect to antecedent basis is again erroneous.  Plaintiffs cite to just three cases, yet in each case, the lack of antecedent basis was more or less a clerical error.  Plaintiffs fail to identify a single case where a claim term having antecedent basis, nonetheless is found to lack antecedent basis, and the claim was not found indefinite in light of attorney argument that a POSA could arbitrarily select one of multiple uses of the term in the specification in order to rewrite the claim.  Unlike the cases cited by Plaintiff, here proper antecedent basis for the second "the body" is critical to understanding the claim.  Thus, if Plaintiffs are correct that "the body" in claim 12 has a different meaning from "body" in claim 1, then "the body" is indefinite for lack of antecedent basis.

---

[4] The specification references the "main body of the incremental count system" (Dkt. 109-1, Ex. 1 at 4:51-52; 6:8); "main body of the inhaler" (6:46; 10:43; 11:11-12; 11:18; 11:30; 12:31; 14:23; 16:6-7; 17:14-15); "body for retaining a medicament store" (*id*. at 7:28; 7:63); "the main canister body" (9:19-21); "inhaler main body" (6:24; 10:36-37; 11:19; 11:24-25; 11:33-34; 12:31); and "actuator body" (1:33-34).

Plaintiffs also argue that there is significance in Aurobindo and Cipla understanding the claim differently, and that this difference somehow supports Teva's position. Rather than being "inconsistent with a finding of indefiniteness," this inconsistent interpretation between the two defendants actually **supports a finding of indefiniteness**.

Accordingly, whether "the body" is interpreted as having antecedent basis and having the same meaning as "body" in claim 1, or as meaning something different and, therefore, lacking antecedent basis, the term "the body" (and the claim) is indefinite.

## I.    <u>"different sides"</u>

| Term | Defendants' Proposal | Plaintiffs' Proposal |
|---|---|---|
| "different sides" | "distinct surfaces where each pin/aperture of the chassis connects to a different face of the body" | "not the same side" |

Plaintiffs ignore both the specification and the prosecution history, and misrepresent the patent figures in order to support their proposed claim construction. The Applicants' arguments during prosecution of related patents, cited by the Examiner in granting allowance, make clear that "different sides" has a particular meaning. This particular meaning was used to distinguish the claims from prior art and cannot be ignored.

Contrary to Plaintiffs' arguments, the pins/apertures in the claims connect to different faces (purple, red, and green lines) of the body of the inhaler, as shown below:



Dkt. 109-1, Ex. 1 at Figs. 8B, 6B (colored notations added). The Applicants' distinguished these connections from prior art, where all of the connections occur on the same face (yellow) of the body:



*See* Dkt. 109-1, Ex. 13 at Fig. 29a (highlighting added). As can be seen in the above images, to distinguish the *Anderson* prior art reference, "different sides" must be interpreted to require each pin/aperture pairing to be on different **surfaces** such that each pin/aperture of the chassis connects to a different face of the body.

Plaintiffs' construction, "not the same side," would improperly recapture the distinguished prior art and thus cannot be correct. For example, under Plaintiffs' construction, the red and green connections in *Anderson* are on "different sides" because they are on the right side and left sides

of the chassis.  However, the Applicants made clear that "Anderson's pins 492a-c and apertures 494 a-c (see above) are each positioned **on the same side** of their respective parts."  *See* Dkt. 109-1, Ex. 10 at 4 (emphasis added).

Any construction of "different sides" must maintain the distinction highlighted by the Applicants.  Accordingly, Defendants' proposed construction should be adopted.

**J.    "formed in the body"**

| Term | Defendants' Proposal | Plaintiffs' Proposal |
|------|----------------------|----------------------|
| "formed in the body" | "an integrated part of the body" | "located in the body" |

Plaintiffs' proposed construction, "located in the body" is an unambiguous attempt to remove the word "formed" and improperly broaden the claim.

Plaintiffs contend that "formed in the body" is a "locational requirement" that merely means that "the dose counter chamber has to be located inside, rather than outside the body of the inhaler."  Pls' Br. at 57.  Plaintiffs' argument is a sleight of hand to avoid the plain limitations of the claim language.  The relevant claim language recites, "wherein the dose counter is positioned **in a dose counter chamber that is <u>formed in the body at a location</u>** beneath the medicament canister."  Dkt. 109-1, Ex. 5 at claim 2 (emphases added).  In other words, the claims already provide a "locational requirement," and not through the use of the phrase "formed in."  Plaintiffs' proposed construction effectively reads "formed" out of the claim:  "formed in the body" does not equate to "in the body," which is the equivalent of "located in the body."  Had the Applicants intended to write a "locational requirement," they clearly knew how to use the words "located in" or "in."

Moreover, as is apparent from the claim language, the phrase "formed in" pertains to the "dose counter chamber."  Yet, instead of examining how the "dose counter chamber" is "formed

in" the body in the context of the specification, Plaintiffs describe how unrelated components are formed, i.e., a projection on a leg and an end stop in the dose counter chamber.  Pls Br. at 58.

Contrary to Plaintiffs' arguments, how a dose counter can be "formed in the body" is clear in the specification—it must be an integrated part of the body consistent with Defendants' proposal.  The "dose counter chamber" is defined by the inner walls of the main body and the inner wall separating the dose counter chamber from the canister chamber, i.e., the separator wall **76**. The separator wall is depicted in the figures as integrated with the inner walls of the main body. There is no suggestion that the dose counter chamber is some undefined, nebulous space inside the body and certainly no suggestion that the dose counter chamber can be removed, as Plaintiffs' construction allows.  To the contrary, the term "formed" is used in the specification 18 times and each use is consistent with Defendants' proposal as an "integrated part" of something.  *See* Dkt. 109-1, Ex. 1 at 1:29-30 ("Such canisters are usually formed from a deep-dawn aluminum cup having a crimped lid . . . ."), 3:16-19 ("Each leg may have at least one said projection formed in an outwardly facing direction thereon, said one or more formations being formed on an inwardly facing engagement surface of the first shaft . . . ."), 3:25-26 ("said formation may comprise a concavity formed on an engagement surface."); *see also* 3:28-33, 8:48-49.  The use of "formed" in the claim is not extraneous verbiage that can be ignored, it must be given its plain and ordinary meaning as Defendants have done.  Thus, Defendants' proposed construction should be adopted.

**K.**    **"positioned at opposite ends of the inside surface of the main body to face each other"**

| Term | Defendants' Proposal | Plaintiffs' Proposal |
|---|---|---|
| "positioned at opposite ends of the inside surface of the main body to face each other" | "positioned directly across from one another such that a straight line can be drawn from one support rail through the center of the longitudinal | "located on opposite sides from one another on the inside surface of the main body, and extending outwardly from the inner wall towards each other" |

| | axis X to the facing support rail" | |
|---|---|---|

Plaintiffs attempt to apply the term "opposite ends" to various irrelevant real-world situations while ignoring the relevant intrinsic evidence.  Regardless of whether 12:00 is at the opposite end of 5:30 on a round clock dial (it is not), the claim language, specification, and prosecution history cannot be ignored in favor of attorney argument.

Plaintiffs do not even attempt to define the term "opposite," the one term in the phrase that requires construction, and fail to provide any support for redefining "ends" to mean "sides." Instead, Plaintiffs incorporate the term "opposite" into the proposed construction; in effect "opposite" means "opposite."  Plaintiffs' examples illustrate the necessity for a definition considering reasonable people can disagree as to whether 5:30 is at the "opposite end" of 12:00 on a clock or whether Los Angeles is the "opposite end" of the country from D.C.

Plaintiffs complain that defining "opposite end" with terminology used in the specification is somehow against Patentees' intentions.  This complaint is premised on the unsupported conclusion that the "diametrically opposed" terminology from the specification is necessarily different from, and narrower than, the term "opposite ends."  Plaintiffs' "opposite-means-opposite" approach fails to resolve the claim construction dispute and lacks support in the specification, prosecution history, or even dictionary definitions to support their conclusion. Plaintiffs' position that Court should not adopt a construction based on the language actually used in the specification, in favor of no construction at all, is illogical and unsupported.  As detailed in Defendants' opening brief, the meaning of the term can, and should, be readily determined from the intrinsic evidence.  *See* Def's Br. at 38-39.

Plaintiffs' reliance on *Augme Techs., Inc. v. Yahoo! Inc.*, 755 F.3d 1326, 1333 (Fed. Cir. 2014) is misplaced.  In *Augme*, unlike here, the court recognized that the term in question

(embedded) had an established plain and ordinary meaning that did not involve using the term itself. *Id.* ("The plain and ordinary meaning of embedded code is code written into the HTML code of the web page. Code which is incorporated into the web page from another location is not embedded, it is linked.")

Finally, Plaintiffs are inconsistent as to whether the Applicants were precise in drafting the claims. For example, in construing "the body" in claim 12 of the '156 Patent, Plaintiffs argue that the three uses of the term "body" in the claim refer to two different components of the invention, if a POSA applies some detective work in the specification and knows how inhalers and dose counters operate. Pls' Br. at 47. However, when interpreting "opposite ends," Plaintiffs argue that the "opposite ends" should be interpreted in a vacuum and the clear teachings of the specification ignored. Plaintiffs cannot have it both ways. Defendants' construction should be adopted.

### L.    "step formed thereon"

| Term | Defendants' Proposal | Plaintiffs' Proposal |
|------|---------------------|---------------------|
| "step formed thereon" | "A stepwise increase in the extent to which the support rail extends inwardly" | "a location of changing width dimension thereon" |

Plaintiffs effectively read the term "step" out of the claim under the guise of "plain meaning." Specifically, Plaintiffs' proposed construction, encompasses slopes or ramps, which are decidedly not "steps." Thus, under Plaintiffs' proposal, the support rail can literally have no steps (such as a gradual slope down the entire rail) and still include "a step formed thereon."

Plaintiffs complain that Defendants' proposed definition precludes the preferred embodiment. Pl.'s Br. at 26. This is incorrect. Plaintiffs erroneously contend that numeral 164 of Fig. 7C does not illustrate a stepwise increase. As can be seen, the portion of the rail preceding 164 has a section of constant width (second portion 162), which in turn is preceded by a first step

160.  The first step 160 is preceded by another portion of constant width.  Dkt. 109-1, Ex. 1 at 15:62-16:3.  Elements 164 (red circle) and 160 (green circle) are stepwise increases.



FIG. 7C

Accordingly, Defendants' proposed construction, the only proposed construction consistent with the plain meaning of "step," should be adopted.

**M.    "aperture"**

| Term | Defendants' Proposal | Plaintiffs' Proposal |
|---|---|---|
| "aperture" | "hole" | "an opening or open space: hole" |

Plaintiffs argue that Defendants' proposed construction is incorrect because it excludes "opening" or "open space," but ignore that Plaintiffs' proposed construction does not recite those terms in a vacuum.  To the contrary, Plaintiffs' construction recites "an opening or open space**:** **hole**."  A colon is punctuation that comes before an explanation, description, or definition.  In other words, Plaintiffs' own dictionary definition narrows "opening or open space" from their broader definitions to being openings or open spaces that are "holes."

In an attempt to avoid the plain meaning of "aperture," Plaintiffs attempt to distinguish a "hole" in a wall through which a pin passes ('289 Patent and '587 Patent) from a hole into which a pin is inserted ('512 Patent).  This is a distinction without meaning.  Although Plaintiffs

characterize one as a hole, and the other as a "cavity," Pl's Br. at 27, this argument ignores that a "cavity" is merely "a space **or hole** in something." *See* Collins Dictionary (Ex. 20).

Plaintiffs claim they are "confused" by Defendants' opposition to their "open space" construction. However, the story Plaintiffs tell regarding the "open fields" example was in response to Plaintiffs' original construction ("an opening, open space, or gap") to highlight the excessive breadth of that construction. Notably, Plaintiffs subsequently amended, and narrowed, their construction to be "an opening or open space: hole." The remaining dispute is that, despite narrowing the words of their construction, Plaintiffs are still interpreting "aperture" to mean any open space, as is evident by their argument that "aperture" includes "'open space' between or among inhaler parts." Pl's Br. at 28. Such an interpretation is not consistent with the plain meaning of "aperture," the intrinsic record, or even Plaintiffs' own proposed construction.

**N.    "count pawl"**

| Term | Defendants' Proposal | Plaintiffs' Proposal |
|---|---|---|
| "count pawl" | "a pawl that is part of the dose counter, separate from an actuator pawl, that is arranged to engage with a second tooth different from the first tooth of the ratchet wheel" | "a pawl that is a component of the dose counter that is capable of engaging with a second tooth of the rachet wheel" |

The parties dispute whether the "count pawl" must be separate from the actuator pawl. Plaintiffs' argument that they need not be separated can be summarized as: "the fact that claims use different words to refer to the 'count pawl' and 'actuator pawl,' does not necessitate that they are physically separate components." Pl's Br. at 29. Plaintiffs rely heavily on case law that allows the same structure to perform multiple roles, however, their blind reliance on that law ignores the claims, specification, and prosecution history.

Claim 1 of the '156 Patent requires that while the actuator pawl is driving the ratchet wheel to rotate, the count pawl is riding along a second tooth. *See* Dkt. 109-1, Ex. 3 at Claim 1. It is

impossible for the same structure to perform both of these actions, as it would require the same pawl to be in two places at once. Similarly, the specification makes clear that the "count pawl" and "actuation pawl" are separate structures. *See* Dkt. 109-1, Ex. 1 at Figs. 10A-10F, 13:43-52, 14:14-59. In addition, the prosecution history confirms that the "count pawl" and "actuation pawl" are separate. For example, the Applicants argued that "[t]he dose counter also includes a **separate count pawl** 138." Dkt. 109-1, Ex. 15 at 7.

Plaintiffs fail to explain why, in this case, the Court should ignore the claims, specification, and prosecution history in order to blindly rely on Plaintiffs' "presumption" that different words do not necessarily mean different structures. Defendants' proposed construction, which is consistent with the claims and intrinsic record, should be adopted.

### III.    CONCLUSION

For the foregoing reasons, and for the reasons set forth in Defendants' Opening Brief, the Court should adopt Defendants' proposed constructions and reject Plaintiffs' proposals.

Dated: September 24, 2021

*Of Counsel*

William R. Zimmerman (*Pro Hac Vice*)
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
1717 Pennsylvania Ave. N.W., Ste. 900
Washington D.C. 20006
Tel: (202) 640-6400
Bill.Zimerman@knobbe.com

William O. Adams (*Pro Hac Vice*)
Karen M. Cassidy (*Pro Hac Vice*)
Brandon G. Smith (*Pro Hac Vice*)
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, 14th Floor
Irvine, CA 92614

*/s/ Gregory D. Miller*
Gregory D. Miller
Gene Y. Kang
**RIVKIN RADLER LLP**
25 Main Street, Suite 501
Court Plaza North
Hackensack, NJ 07601-7082
Telephone: (201) 287-2460
Facsimile: (201) 489-0495
Email: Gregory.miller@rivkin.com

*Attorneys for Defendant/Counterclaimant Cipla Ltd.*

Tel: (949) 760-0404
William.adams@knobbe.com
Karen.Cassidy@knobbe.com
Brandon.Smith@knobbe.com

Joseph M. Reisman (*Pro Hac Vice*)
Ashley C. Morales (*Pro Hac Vice*)
Mark Rubinshtein, Ph.D. (*Pro Hac Vice*)
**KNOBBE, MARTENS, OLSON &
BEAR, LLP**
3579 Valley Centre Dr. Suite 300
San Diego, CA 92130
Tel: (858) 707-4000
Joseph.Reisman@knobbe.com
Ashley.Morales@knobbe.com
Mark.Rubinshtein@knobbe.com

September 24, 2021

*Of Counsel*

William D. Hare
McNeely Hare & War, LLP
5335 Wisconsin Avenue, N.W., Suite 440
Washington, DC 20015
(202)640-1801
bill@miplaw.com

53937688

/s/ Christopher Casieri

Christopher Casieri
McNeely Hare & War LLP
12 Roszel Road, Suite C104
Princeton, NJ 08540
(609)731-3558
Chris@Miplaw.Com

*Attorneys for Defendants/Counterclaimants
Aurobindo Pharma Ltd., Aurobindo Pharma
USA, Inc., Aurolife Pharma LLC*