1

2                    *UNITED STATES DISTRICT COURT*
                  *FOR THE DISTRICT OF NEW JERSEY*
3

4    �700000000000000000000000000    *CIVIL ACTION NUMBER:*

*TEVA BRANDED PHARMACEUTICAL*
5    *PRODUCTS R&D, INC., and*          *20 Civ. 10172 (JXN)*
*NORTON (WATERFORD) LTD.,*
6                                      *FINAL PRETRIAL CONFERENCE*

         *Plaintiffs,*
7

          *v.*
8

*CIPLA., AUROBINDO PHARMA*
9    *LLC, AUROBINDO PHARMA USA,*
*INC., and AUROLIFE PHARMA*
10   *LLC,*

11        *Defendants.*

12   ▔▔▔▔▔▔▔▔▔▔▔▔▔▔▔▔▔▔▔▔▔▔▔▔▔▔

         *Martin Luther King Building & U.S. Courthouse*
13       *50 Walnut Street*
         *Newark, New Jersey 07101*
14       *Thursday, November 10, 2022*
         *Commencing at 10:32 a.m.*
15

16   *B E F O R E:*            *THE HONORABLE JULIEN XAVIER NEALS*
                             *UNITED STATES DISTRICT JUDGE*
17

*A P P E A R A N C E S:*
18

19       *WALSH PIZZI O'REILLY FALANGA LLP*
         *BY:  WILLIAM T. WALSH JR, ESQUIRE*
20       *Three Gateway Center, 100 Mulberry Street - 15th Floor*
         *Newark, New Jersey 07102*
21       *For the Plaintiffs*

22

23       *Melissa A. Mormile, Official Court Reporter*
              *melissa_mormile@njd.uscourts.gov*
24                 *(973) 776-7710*

25

1    <u>**A P P E A R A N C E S: - CONTINUED**</u>

2

3        WILLIAMS & CONNOLLY LLP
         BY:  BENJAMIN M. GREENBLUM, ESQUIRE
4             DAVID I. BERL, ESQUIRE
              BEN PICOZZI, ESQUIRE
5             KATHRYN S. KAYALI, ESQUIRE
         680 Maine Avenue SW
6        Washington,DC 20024
         For the Plaintiffs

7

8        RIVKIN RADLER LLP
         BY:  GENE Y. KANG, ESQUIRE
9        25 Main Street - Suite 501, Court Plaza North
         Hackensack, New Jersey 07601
10       For the Defendant Cipla

11       KNOBBE MARTENS OLSON & BEAR LLP
         BY:  WILLIAM O. ADAMS, ESQUIRE
12            BRANDON G. SMITH, ESQUIRE
         2040 Main Street - 14th Floor
13       Irvine, California 96614
         For the Defendant Cipla

14

15       KNOBBE MARTENS OLSON & BEAR LLP
         BY:  JONATHAN E. BACHAND, ESQUIRE
16            WILLIAM R. ZIMMERMAN, ESQUIRE
         1717 Pennsylvania Avenue NW, Suite 900
17       Washington, DC 20006
         Counsel for the Defendant Cipla

18

19       MCNEELY HARE & WAR LLP
         BY:  CHRISTOPHER CASIERI, ESQUIRE
20       12 Roszel Road - Suite C104
         Princeton, New Jersey 08540
21       For the Defendant Aurobindo

22

23

24

25

*United States District Court*
*District of New Jersey*

```
 1            (PROCEEDINGS held in open court before The Honorable
 2    JULIEN XAVIER NEALS, United States District Judge, at 10:32
 3    a.m.)
 4            THE COURTROOM DEPUTY:  All rise.
 5            The Honorable Julien Xavier Neals presiding.
 6            THE COURT:  Good morning, Counsel.
 7          Please be seated.
 8            THE COURTROOM DEPUTY:  We are on the record in
 9    Teva Branded Pharmaceutical, Products R&D, Inc., et. al. v.
10    Cipla, LTD, et. al; case number 20 Civ. 10172.
11            THE COURT:  Counsel, your appearances, please.
12            MR. WALSH:  Good morning, your Honor.
13          William Walsh, of Walsh Pizzi O'Reilly Falanga, on
14    behalf of plaintiff Teva.
15            With me is my co-counsel from Williams & Connolly, and I
16    will let them introduce themselves.
17            MR. GREENBLUM:  Good morning, your Honor.
18          Ben Greenblum, from Williams & Connolly for Teva; and
19    with me are my colleagues, Ben Picozzi and Kat Kayali, also
20    from Williams & Connolly.
21            THE COURT:  Good morning, Counsel.
22            MR. KANG:  Good morning, your Honor.
23          Gene Kang, from Rivkin Radler LLP, for defendant Cipla
24    Limited.  I am joined by co-counsel, William Adams, Bill
25    Zimmerman, Brandon Smith, and Jonathan Bachand from Knobbe
```

```
 1   Martens.
 2          THE COURT:  Good morning.
 3          MR. CASIERI:  Good morning.
 4       Chris Casieri, McNeely, Hare & War, for Aurobindo.
 5          THE COURT:  Good morning.
 6          MR. CASIERI:  Good morning.
 7          THE COURT:  All right.
 8       Counsel, we are here for the housekeeping, the long
 9   awaited housekeeping in this case.
10       Just with the matter of housekeeping, I note that there
11   was a file pretrial that was provided today, a revised
12   pretrial.
13       I also note that we have the motion pending with regard
14   to Counts 5 and 11 as to Cipla's answer, defenses and
15   counterclaim and also with regard to the open matter as to the
16   Markman decision.
17       With regard to the final pretrial, someone either partly
18   summarize for the Court what was in today's final pretrial,
19   what the modifications were to the last pretrial order?
20          MR. GREENBLUM:  Good morning, your Honor.
21   Ben Greenblum, again from Williams & Connolly.
22       The pretrial order, I believe it was submitted -- the
23   revised one was submitted on Friday, and I think it was entered
24   by Magistrate Judge Hammer yesterday.
25       In substance, it -- I would describe it as making two
```

1  changes, one is that it reflects where the parties are at --

2  and by parties I mean Teva and Cipla, not Aurobindo -- with

3  respect to this dispute on the '156 patent that your Honor will

4  be hearing more about this morning.  And so we sort of tee'd

5  that up in the revised pretrial order to say if it's in, here's

6  what happens.  If it's not in, here is what happens.

7        The second issue is that we informed the defendants that

8  there were a few claims of patents that are remaining in the

9  case that we will not be proceeding on at trial, and so the

10  parties just agreed to remove the to and the fro, if you will,

11  about those claims from the pretrial order.

12        Those are the only substantive changes I can recall.

13  I'm happy to be corrected if --

14        MR. ADAMS:  That's right, your Honor.

15        William Adams, for the Cipla defendants.

16        I think that's accurate.

17        I mean, there are some housekeeping, when this hearing

18  occurred, that was updated, those types of things.

19        I think substantively that is correct.

20        THE COURT:  All right.  Counsel, you just had

21  mentioned with regard to the '156 patent, did you want to have

22  a discussion about that now?

23        Was there some things that the parties wanted to point

24  out with regard to that now?

25        MR. GREENBLUM:  We were hoping to present brief

1    argument, if it was acceptable to the Court.

2          And my colleague, Mr. Picozzi, will be handling that for

3    Teva whenever the Court is prepared to hear it.

4          THE COURT:  I would actually propose, unless the

5    parties have different thoughts on it, to have arguments on

6    '156 now, as a matter of fact.

7          MR. GREENBLUM:  That's acceptable, certainly, to Teva,

8    your Honor.

9          MR. ADAMS:  That's fine, your Honor.

10         THE COURT:  All right.

11     So you can proceed on that.

12         MR. PICOZZI:  Good morning, your Honor.

13         THE COURT:  Good morning.

14         MR. PICOZZI:  Ben Picozzi, for the plaintiff.

15         THE COURT:  Good morning.

16         MR. PICOZZI:  As we said in our briefs, we think that

17    this issue is straightforward.

18          The relative facts are -- the relevant facts are not in

19    dispute here.

20          Everyone agrees that for the only potential basis that

21    this Court could possibly have for jurisdiction over the '156

22    patent is the possibility that a judgment for Cipla on that

23    patent could be used to trigger the forfeiture of the first

24    applicant's exclusivity.

25          Everyone also agrees that to do that Cipla needs to

1    complete a complicated jigsaw puzzle of events.  And everyone

2    also agrees that Cipla can't do that based on the patents and

3    claims that it has currently pending.

4          As we've laid out in our briefing, there are at least

5    three patents that Cipla would need to get judgments in order

6    for it to even have a hope of triggering forfeiture, that is

7    the '156 patent, which is the patent at issue in Teva's motion,

8    but also the '509 and '510 patents.

9          The parties agreed and this Court entered an order more

10   than a year ago that dismissed their claims as to the '509 and

11   '510 patents.

12         Those patents are out of this case and Cipla does not

13   have any pending litigation anywhere in the world as to those

14   patents.

15         And that is a fundamental problem for Cipla because

16   courts from the Supreme Court on down have applied what is

17   commonly referred to as the rule against piecemeal litigation.

18   And that means that jurisdiction does not exist unless, based

19   on pending litigation, a requested judgment would have some

20   kind of effect that would completely resolve the parties'

21   dispute, the case in controversy in question.

22         Now, Cipla's response to that is to say that this is a

23   special Hatch-Waxman case and so a different result should be

24   obtained here.

25         The problem for Cipla, though, is that there is no

1  special rule for Hatch-Waxman cases.

2        In fact, you know, we think it's ironic that they spent

3  a lot of time trying to distinguish the nonHatch-Waxman cases

4  because many of the cases that were relied in our opening

5  brief, to give you a couple of examples, the *Dey* case, the

6  *Janssen* case as well as the *Impax* case, which are cited on

7  pages 7 through 10 of our opening brief, as well as the *Caraco*

8  case, which is discussed in the opposition and reply briefs,

9  are all Hatch-Waxman cases.

10        And in each of those cases, the Courts applied a rule

11  that is consistent with the rule against piecemeal litigation.

12        And, you know, unless the Court needs any clearer

13  indication that the same rules apply in Hatch-Waxman cases as

14  in the ordinary course, it need look no further than the

15  *Dey Pharma* case, which is quoted, in relevant part, both in our

16  opening brief as well as page 12 of Cipla's opposition.

17        And in that case, the Court said upholding jurisdiction

18  simply eliminating one barrier, by which it meant one patent,

19  is sufficient for declaratory judgment, quote, so long as

20  litigation is also pending that would eliminate the other

21  barriers.

22        In other words, in that case, Hatch-Waxman case, the

23  Court directly applied the rule against piecemeal litigation

24  and found that jurisdiction existed in that basis because the

25  declaratory judgment plaintiff there did, in fact, have pending

1  litigation as to all of the relevant patents.

2       That's, of course, not the case here where Cipla would

3  need further additional nonfiled litigation on the '509 and

4  '510 patents for it to meet the jurisdictional limit.

5       You know, as further evidenced that the ordinary rules

6  apply in Hatch-Waxman cases, the federal circuit then turned

7  around and reaffirmed that principle in the *AbbVie* case, which

8  was not the Hatch-Waxman case.  It was an ordinary patent case

9  that also involved the contract license dispute.

10      In that case, the federal circuit held that because a

11 judgment on just the patent claim without a further litigation

12 over the underlying contractual dispute would have no effect on

13 the parties ultimate dispute, that jurisdiction did not exist.

14 And as support for that rule, it quoted that very same passage

15 from *Dey* and said that because the parties' case or controversy

16 could not be resolved based on pending litigation, that the

17 Court didn't have jurisdiction and, therefore, dismissal was

18 required.

19      One last brief point, your Honor, unless your Honor has

20 further questions, throughout their opposition, Cipla argues

21 that this Court should hear arguments, should maintain

22 proceedings because it's too late; because the interest of

23 efficiency and fairness would be served for this Court to hear

24 argument.

25      Frankly, your Honor, you know, our client and theirs

1  have different views of the sequence of events, but,

2  ultimately, none of that matters.

3       Subject matter jurisdiction is a threshold question

4  about the Court's constitutional authority to hear the matter.

5       It is not about whether it would be convenient for Cipla

6  or any other party to obtain an advisory opinion as to the

7  '156 patent.

8            THE COURT:  Thank you, Counsel.

9            MR. PICOZZI:  Thank you, your Honor.

10           MR. ZIMMERMAN:  Good morning, your Honor.

11       Bill Zimmerman from Knobbe Martens.

12       I think the parties are in agreement as to the relevant

13  facts.

14       There isn't a factual dispute here.

15       The '156 patent was in the case.

16       At the pretrial conference, Teva granted us a covenant

17  not to sue.

18       There was a dispute over the form of the judgment.  And

19  then Teva moved to dismiss.

20       Now, Teva originally argued that the covenant not to sue

21  by itself divests this Court of jurisdiction.

22       I think the parties have all agreed that in view of

23  *Caraco* 527 F.3rd 1278, that argument simply doesn't hold water.

24  The federal circuit had held that the presence of a covenant in

25  the Hatch-Waxman context is not enough.

1          And so I don't think we have a real dispute there.

2          The dispute is:  Does there have to be pending

3     litigation on the '509 and '510 patents?

4          And I'm going to give you some context on that, and then

5     go through the law on it.

6          And the context is the '509 and '510 patents were

7     originally in this case at an early stage.

8          They were dismissed in May of '21 when there were still

9     numerous patents in play, and so it was an early stage.

10         The '156 patent has been in the case in its entirety.

11    They filed the covenant at the pretrial conference, said we

12    would be dismissing it, and then there were two weeks

13    afterwards.

14         So there was no reason to file a DJ on the '509 and '510

15    patents.  The timing of that DJ didn't impact anything.

16    Certainly, not with respect to the '156 patent because it was

17    in the case.

18         And so where does Cipla have to go to clear the path to

19    get to the market?

20         Counsel described it as a complicated jigsaw puzzle.

21         It is really very straightforward.

22         They have to win on the patents that we are going to go

23    to trial on starting Monday and that includes the '156 -- or

24    doesn't depending on your ruling.

25         We have to obtain a judgment on the '156 patent, a final

1    judgment of noninfringement or invalidity either in this case

2    or a follow-on case.

3         And then we have to get a judgment on the '509 and '510

4    patents, which Teva has already conceded they are not going to

5    assert against us, and they've already told us we don't

6    infringe the '156 patent.

7         So those last two pieces should be straightforward and

8    easy.

9         The question is whether the '156 patent is at issue in

10   this case.

11        Now, there's no dispute that there isn't current pending

12   litigation on the '509 and '510 patents, but Cipla doesn't

13   believe that that's required under the all circumstances test

14   for subject matter jurisdiction under the federal circuit

15   precedent.

16        Now, counsel referred to three cases, *Dey*, *Janssen* and

17   *Impax*, and I want to draw the distinctions very clearly.

18        In *Janssen*, the ANDA filer had stipulated to

19   infringement and validity of one of the patents.

20        So the Court said based on those actions, there is no

21   circumstances under which you can get a challenge to clear all

22   of the patents because you foreclosed one of them.

23        And then in the *Impax* case, *Impax* had agreed to be bound

24   by a judgment on one of the patents in another case.  And the

25   Court said because you agreed to this, there's no circumstances

1  under which you can get relief as to all of the patents.

2      Cipla has not taken any actions which precluded from

3  getting relief under the '509 and '510 patents.

4      And counsel, I think, will agree to that.

5      And so we're left with the question of does there

6  actually have to be litigation at this moment on the '509 and

7  '510 patent?

8      And there is a statement in the *Dey* case that

9  acknowledges that in that case there was litigation pending on

10 the other patent.  And the statement is, as we have held under

11 materially identical facts in *Caraco*, simply eliminating one

12 barrier is sufficient so long as litigation is also pending

13 that could eliminate the other barriers.

14     So in that case and in *Caraco*, there were parallel cases

15 pending.  But both of those cases involved parallel actions

16 that happened at early stages.  Somebody filed to clear the

17 path.  Because there was no dispute, they were going to have to

18 have all of those patents in play.

19     And there's no dispute here that we need all the patents

20 in play.

21     But if you read the collection of cases, *Caraco*,

22 *Janssen*, *Impax* and *Dey*, part of the reason they allowed

23 declaratory judgment in the Hatch-Waxman context is to prevent

24 gaming of the system.  They don't want the scenario where

25 brands selectively don't assert patents so that they can use

1  the regulatory scheme to prevent approval.  That's why all of

2  those cases allowed declaratory judgment jurisdiction in this

3  context.

4       And they talk about the gamesmanship that leads to the

5  decisions.

6       So we have a situation here -- and I haven't found it in

7  any other case -- most likely *Caraco*, *Janssen*, and *Impax* are

8  all early stages of the litigation.

9       Here we have the situation where the patent we're

10  fighting over is trial ready.  The parties have everything in

11  the pretrial brief.  We've spent two and a half years on this

12  patent.  We're ready to go to trial Monday.

13       If that patent doesn't get tried, it's going to be

14  another two years after we file a declaratory judgment on that

15  patent and the '509 and '510 patent.

16       We are going to repeat everything we have just done, and

17  Teva is going to get rewarded for the gamesmanship of dropping

18  that patent at the pretrial conference.

19       That's exactly what declaratory judgment in this context

20  is meant to prevent.

21       Now, there's a question about the piecemeal

22  adjudication.

23       I want to clear up -- the Hatch-Waxman scheme is

24  described in the *Caraco* case very well, and they say it's an

25  artificial act of infringement for purposes of establishing

1  jurisdiction in the federal courts, and the statute is 35

2  U.S.C. 271(e)(2).

3      The entire drug litigation for Hatch-Waxman is done

4  under the specter of hypothetical situations.

5      Normally, in a patent case -- and they refer to them as

6  ordinary patent cases -- somebody sells a product, and you are

7  trying to stop them.

8      We all know what the conduct is.

9      Hatch-Waxman creates this artificial system where you

10 file your application with the FDA, and in 45 days you start a

11 litigation.  In parallel with that, the FDA is reviewing your

12 application, and so the entirety of the world may change in the

13 context of your litigation.

14     The FDA may require you to tighten specs.  The brand may

15 change the label necessitating changes in the ANDA.  There may

16 be new guidance requirements that require changes to the ANDA.

17 Everybody agrees the ANDA can change.

18     And what happens in the litigation may ultimately be

19 rendered moot by the fact that you don't get approval or the

20 approval requirements change.

21     So this is a context where the entirety of the

22 litigation is speculative and could be rendered moot.

23     But, nevertheless, Congress has said we're going to

24 strike this balance and give you this artificial jurisdiction

25 so we can get generic drugs to the market faster.

1        So it is a unique context.  It is different, and I want

2   to be very clear.  If this Court interprets the precedent as

3   requiring a case on the '509 and '510 patents, we haven't done

4   that yet.  It is coming, but there was no reason to speed that

5   along.  If it's not required, then we all agree we're going to

6   trial Monday on the '156 patent.

7        And I want to talk about what happens if we get this

8   wrong just to be sure we're all on the same page.

9        If the Court says there's jurisdiction, and we try it

10   and it turns out there wasn't, then nobody is worse for wear.

11   We're having the trial anyway.  It's already tee'd up.  The

12   work is already done.  Nobody is harmed.

13        If there is jurisdiction and we don't try that patent,

14   there is no way to fix it for Cipla.  We will be two years down

15   the road, find out we should have tried it, and there's no way

16   to make up for that time.

17        And Teva benefits from the delay and Cipla is harmed.

18        So if there is any question that it's close, it should

19   be that we try the patent to prevent harm because nothing harms

20   Teva by trying the patent.

21        Unless you have further questions, your Honor.

22        THE COURT:  Counsel, the dismissal as to Cipla for

23   '509 and '510, that was in June of 2021?

24        MR. ZIMMERMAN:  Yes.

25        THE COURT:  When that occurred, what was Cipla's

1  position?

2       Are you saying at that point they didn't know exactly

3  which patents were going to be required for ultimately to prove

4  the case?

5            MR. ZIMMERMAN:  No, your Honor.

6       At that point in the case, we were still early on in

7  discovery, and Cipla said, okay, we will get these out.  We

8  will narrow the universe.

9       At that point, we expected that the first filer would

10  launch and trigger their own exclusivity.  So we didn't think

11  we were going to have to clear the path.

12       We're now a year and a half later.

13       The first filer hasn't launched.

14       The FDA has reviewed Cipla's ANDA, and we're getting

15  closer and closer to approval.  And so the parking issue has

16  become real.

17       And given that we hadn't expended a bunch of time and

18  effort on the '509 and '510 patents, we let them go at the

19  early stage.  We are now realizing, okay, we knew we were going

20  to need the DJ on them as we got closer to trial and the first

21  filer hadn't launched.  And so we're also going to need that on

22  the '156, but we've already expended all the effort on the '156

23  patent.

24       That's why we're fighting so hard to keep it in.

25            THE COURT:  Just one other point, and I don't need to

1    necessarily know the backstory to it, but when the stipulations

2    were entered as to Aurobindo, those had a provision for

3    noninfringement?

4            MR. ZIMMERMAN:  For Aurobindo's stipulation?

5            THE COURT:  Yes.

6            MR. ZIMMERMAN:  I believe it did.

7            THE COURT:  Okay.

8        Thank you, Counsel.

9            MR. ZIMMERMAN:  Thank you, your Honor.

10           THE COURT:  Counsel.

11           MR. PICOZZI:  Your Honor, I would like to begin where

12   Mr. Zimmerman left off, which was on the point about fairness

13   and gamesmanship.

14       Mr. Zimmerman just admitted that Cipla's predicament is

15   not the result of any gamesmanship on the part of Teva, but

16   calculations that Cipla itself made about what patents might or

17   might not be important when it agreed to dismiss those claims.

18       More fundamentally, though, each of the points that

19   Mr. Zimmerman raised during his presentation was an attempt to

20   add an additional exception to the rule against piecemeal

21   litigation that is not supported by a single case.

22       There is no exception, for example, on the basis of

23   fairness or efficiency and, in fact, the case law says the

24   opposite.

25       We cite several cases on the final page of our reply

1    brief that explain why no such exception exists.

2         And those cases include the *Hercules* case, which is a

3    Supreme Court case holding that because subject matter

4    jurisdiction is jurisdictional, that fairness concerns and

5    equity concerns don't matter.

6         The same is true of the First Circuit case that we cite

7    as well as the District of Arizona case, which in a patent case

8    very similar to this one, the Court dismissed for subject

9    matter jurisdiction based on a covenant not to sue that was

10   issued on the eve of trial.

11        The second punitive exception that Mr. Zimmerman

12   referred to was that there was some distinction between early

13   stage versus late stage litigation and that posture makes a

14   difference.

15        In fact, no such exception exists, and none of the cases

16   that anyone has cited refer to any such exception.

17        The final exception that Mr. Zimmerman refers to is --

18   really goes back to the point of efficiency.  That, well, we

19   should hear argument on the '156 patent because it is tee'd up,

20   and we may file DJ actions on the '509 and '510 patent.

21        Again, you know, there is not a single case in which the

22   fact pattern supports that particular distinction.  And,

23   tellingly, Mr. Zimmerman does not say anything at all about the

24   *AbbVie* case, which is a case by the federal circuit that

25   interpreted *Dey* and applied the ruling in *Dey* that there must

1  be pending litigation that would grant finality -- final

2  conclusion to the case or controversy.

3        And in that case, again, the Court did not make any

4  exceptions based on any of the ones that Mr. Zimmerman has held

5  on.

6        Unless your Honor has any further questions...

7        THE COURT:  Counsel, with regard to the requirement

8  that there must be pending litigation, are there any exceptions

9  to that?

10        MR. PICOZZI:  None -- certainly none that are in any

11  of the cases that either party have cited, and I'm not aware of

12  any.

13        THE COURT:  Thank you, Counsel.

14        MR. GREENBLUM:  Your Honor, if I could just add one

15  thing to the question that you asked at the end of

16  Mr. Zimmerman's argument about the stipulation that Aurobindo

17  entered, just to crystalize it for the Court, because we

18  discussed this and I handled it for Teva with Judge Hammer.

19        The stipulation that Aurobindo agreed to and it was so

20  ordered by the Court as to those patents and as to the '156

21  provided judgments but not findings based on evidence.  And

22  that was -- the parties here were unable to agree, that is Teva

23  and Cipla.  Cipla wanted those findings, and we didn't think

24  they were appropriate or justified.  And Judge Hammer said,

25  well, look, I can't order a stipulation that the parties don't

1   agree to.  And we understand that, but I just wanted to

2   crystalize for the Court.  We remain amenable to a stipulation

3   that would enter a judgment on the '156 in the form that we had

4   submitted to Judge Hammer and submitted to Cipla without the

5   findings language.

6           So I just wanted to be responsive to the Court's query

7   about stipulation.

8           THE COURT:  So that language then would read along the

9   lines of that the Court entered judgment of noninfringement as

10  to counts so-and-so?

11          MR. GREENBLUM:  Yes, your Honor.

12          THE COURT:  Okay.

13      Mr. Zimmerman, anything further?

14          MR. ZIMMERMAN:  Your Honor, I just want to address two

15  points.

16          The first one was there seemed to be a statement that

17  this is a problem of Cipla's own making.  And I want to be very

18  clear on that.

19          There was absolutely no dispute between the parties

20  until Teva dropped the '156 patent at the pretrial conference.

21          Their actions are what necessitated this whole thing.

22  There was no problem at all.  We were happy to try the

23  '156 patent.

24          It is exclusively Teva's conduct.

25          And the next point is the distinction they are drawing

1    about you have to have pending litigation.  That distinction --

2    so if I would have walked into the clerk's office this morning

3    and dropped off a '509 and '510 complaint, Teva's position is

4    that, okay, there is jurisdiction.  Everything is fine.  We can

5    try the patent on Monday.

6         If I walk out of this hearing and drop it in the

7    courtroom -- in the clerk's office, they are saying there is no

8    jurisdiction because you didn't do it before the hearing.

9         That can't be what the rule is with respect to

10   jurisdiction in this context.

11        Thank you.

12          THE COURT:  One question for both parties.

13        Regarding pending litigation, if the '156 was an aspect,

14   even taking '509 and '510 for example, so this case is not

15   finally concluded.  So there's been no final determination in

16   this case.

17        Pending litigation means that the claims themselves

18   still have to be active, I take it, is what the parties would

19   be saying as well.

20          MR. PICOZZI:  That's correct, your Honor.

21          MR. ZIMMERMAN:  That is correct, your Honor.

22          THE COURT:  Okay.

23        While we're on the point of '156, just to review, I know

24   you have identified this specifically in the pretrial order

25   then, "the if and if not."  So with regard to if it remains in

1  the case, what the impact is and if it's out of the case, what

2  the impact is.

3          MR. GREENBLUM:  Yes, your Honor.

4          THE COURT:  And that also talks about the claims

5  meaning construction and things as well?

6          MR. GREENBLUM:  I don't know if -- I think the

7  pretrial order would specify the claims that would need to be

8  construed.

9      I don't recall how much it discussed what the Court

10  would need to do about it, but that would be in the Markman

11  briefing before the Court.

12          THE COURT:  Understood.

13      Just in terms of those claims, if '156 is out, what

14  remains in the case as far as proof issues, but I'm sure that's

15  spelled out in here.

16          MR. GREENBLUM:  That is certainly spelled out,

17  your Honor.  Yes.

18          THE COURT:  Okay.

19      With regard to '156 in or out, do the parties have an

20  idea --  and you probably spelled it out in here as well --

21  what impact that would have on the trial schedule?

22          MR. GREENBLUM:  I know that at the conference we had

23  in front of Judge Hammer in September, Cipla indicated they

24  thought it would be very difficult to fit the trial into the

25  four days that the Court has allotted if the '156 was in.

1           So I think we will get it done on the schedule that the

2    Court gives us.

3           We think it would certainly add a number of issues that,

4    for the reasons Mr. Picozzi explained, we think are

5    unnecessary.  And it would certainly make it more difficult to

6    get it done in the allotted time.

7           I think we probably agree with Cipla about that.

8             THE COURT:  Okay.

9             MR. ADAMS:  Your Honor, the '156 patent, I think, is

10   pretty streamlined.

11          If left in the case, the covenant not to sue on it, we

12   have a very clear noninfringement position on it.  I thing it

13   doesn't change the fact that we can get this trial done in four

14   days.  I don't think it adds another day.  I don't think that's

15   the issue.  So I think as we talked about the pretrial

16   conference, it can still be done in four days.

17            THE COURT:  You won't get cut off if it ends up going

18   past four days because we anticipated.  We allotted more time

19   than that as well.  This is just more for the Court's own

20   purposes in terms of anticipation.

21          So you are not going to be foreclosed one way or another

22   if your estimates or guesstimates are wrong with regard to it

23   being in or out.

24            MR. GREENBLUM:  One thing I just want to comment,

25   your Honor, in response to Mr. Adams is that it kind of goes

1  back to the stipulation issue.

2      If all they needed was a judgment of noninfringement, I

3  agree with Mr. Adams.  It wouldn't take up any time at trial.

4  They want findings.  They want to put in evidence.  They want

5  to put on expert testimony.  Those are the things that are

6  necessary before the Court would make findings.  That takes

7  more than -- you know, that's time.  That's testimony.  That's

8  evidence that the Court would have to hear.

9      MR. ADAMS:  Your Honor, we do want a finding, and let

10 me just clarify why.

11     The Hatch-Waxman statue doesn't just say a judgment.  It

12 says a finding of invalidity of noninfringement.  So that's why

13 when we talk about why we can't agree to that language, Cipla

14 needs that to trigger the first filer, as Mr. Zimmerman

15 presented that.

16     But I think in terms of the procedure at trial, as

17 Mr. Zimmerman said, the '156 patent is ready to go.

18     In my opinion, the analysis of that '156 patent is

19 pretty streamlined.  We have a covenant not to sue on it.  It

20 is a straightforward, noninfringement position.

21     Again, your Honor, I don't think it adds a lot of time

22 to the trial.  I think we still get the trial done in four

23 days.

24     MR. GREENBLUM:  At the risk of having the Court

25 reverse itself on you won't cut us off, the revised pretrial

1    order, as I read Cipla's position, reflects that if the Court

2    exerts jurisdiction over the '156 and keeps it in the case,

3    they are going to put on evidence asking the Court to make

4    findings about invalidity on which a covenant not to sue would

5    not be relevant.

6        So there would need to be claim construction from the

7    Court, testimony from experts, documents, and argument about

8    validity and that -- you know, so I don't think that the issue

9    would be as simple as at trial here is the covenant, you're

10   done, you can make findings.

11       You can't make findings based on a covenant, but you

12   certainly can't make findings about invalidity.

13       THE COURT:  With regard to that, a finding of

14   noninfringement is not enough; Cipla is looking for more than

15   that.

16       MR. ADAMS:  Your Honor, a finding of noninfringement

17   is enough for Hatch-Waxman to trigger.

18       The Hatch-Waxman statute says finding a noninfringement

19   or invalidity.  So this case is -- again, until right up to the

20   pretrial conference, Cipla is ready to do both noninfringement

21   and invalidity.  That is why it is reflected in the pretrial

22   order.

23       But, again, a finding of noninfringement, which I do

24   believe is very straightforward in this case on the '156, is

25   all Cipla needs from your Honor, and that's what we are looking

1    for.

2         THE COURT:  The reason the Court asks, and unless I'm

3    missing something in the discussion, I understood that Teva was

4    offering a stipulation that provided similar language that they

5    provided to Aurobindo, which did have noninfringement language

6    in it.

7         MR. GREENBLUM:  It had language about a judgment of

8    noninfringement, not about findings based on evidence.

9         THE COURT:  So we need a findings based on evidence,

10   not a judgment of.

11        MR. ADAMS:  Your Honor, that's right.

12        It's not because Cipla is trying to make this thing

13   complicated or hard.

14        It's we're tracking the statute.

15        The Hatch-Waxman statute says a finding of

16   noninfringement or invalidity.  We are looking for that

17   finding.

18        Congress thought about this.  In that statute, it says

19   the parties could reach a consent order.  The parties could

20   agree to that language, submit it to the Court, and the Court

21   could sign it.

22        So Congress understood that.  They said there could be a

23   consent order where the parties sign that says a finding of

24   judgment and noninfringement.  We asked for that.  Teva refused

25   to give us that, but that's what we are looking for, finding of

1    noninfringement.

2            MR. GREENBLUM:  Our position is that the stipulations

3    should just follow the courses, all of the prior ones, which

4    didn't make findings, because we don't think courts make

5    findings based upon stipulations.  Courts hear evidence in the

6    box and make findings.

7            THE COURT:  Not to beat the point, but to beat the

8    point, if the Court were to enter an order proposed by the

9    parties that has some sort of findings language, there would

10   have been no formal findings by the Court.

11           So I don't want to rehash the whole discussion that

12   happened before Judge Hammer, but I'm realizing that maybe we

13   might even had a discussion with counsel off the record between

14   now and Monday.  I may just look at the record just to get a

15   little bit more understanding of what the language was that

16   prevented the barrier to '156.

17           At any rate, we will be prepared to render a decision on

18   '156 on Monday.

19           Was there anything else with regard to '156, or are we

20   okay with '156?

21               MR. GREENBLUM:  No, your Honor.

22               MR. ADAMS:  No, your Honor.

23               THE COURT:  So we also have a Markman opinion that's

24   prepared that the Court is also prepared to render on Monday,

25   and I anticipate that there will, obviously, be some impact on

your trial -- not preparation because I am sure you prepared on everything -- but just in terms of how the trial proceeds once you have the actual construction terms.

With regard to those two decisions that we will be rendering on Monday, we will have the opportunity to discuss in more detail than in terms of what impacts, if there's any additional concerns as far as counsel have in terms of proof presentation, order of your case, or anything else.

Now with regard to any particular issues, any particular problems from a practical standpoint in terms of going forward with trial, availability, any issues at all?

MR. GREENBLUM:  No, your Honor, we are prepared to proceed on Monday.

I guess one question I would have for the Court is: Does the Court anticipate issuing the Markman and '156 rulings in the morning?

The question, the reason I ask is it will certainly effect our opening presentation.  I am sure it will effect my colleagues' opening presentation, and we might need to just sort of work together with the Court on the timing of that to make sure we're not talking to you about things that are out or are in that we didn't anticipate being in.

THE COURT:  We anticipate Monday morning or possibly...

And as a matter of fact, my dutiful law clerk just

1  reminded me, that because we've had these issues with the

2  motion and with Markman, is that you would do your actual

3  openings on Wednesday instead of Monday to give you an

4  opportunity to digest what we provide to you.

5       MR. GREENBLUM:  One suggestion I would make without

6  talking to my team, which is always some peril, is to start on

7  Tuesday so that we could try to fit it in.  Because witnesses

8  have come in and if we start it on Wednesday, I think under the

9  current schedule we wouldn't finish next week.

10      So if we got the rulings on Monday, we would be prepared

11 to be with your Honor Tuesday morning.  I think that would suit

12 Teva.

13      THE COURT:  We can accommodate Tuesday.

14      MR. GREENBLUM:  Thank you, your Honor.

15      One further minor housekeeping issue that that raises is

16 that under the current pretrial order, the parties were to

17 exchange disclosures of their opening slides to one another to

18 make sure there is no objections on Saturday evening before

19 Monday morning trial.

20      We would propose to exchange those Monday evening after

21 we've had a chance, both sides, to digest the Court's rulings

22 and exchange those Monday evening before Tuesday morning start.

23      THE COURT:  That's fine with the Court as long as the

24 parties are fine with that as well.

25      MR. ADAMS:  Your Honor, I think part of the issue is

1  just the whole reason we agree upfront to exchange in time, it

2  is generally 48 hours, is so that the parties can understand

3  the evidence that they are going to present and they can

4  understand our evidence and be prepared on that.  I think

5  Monday night is too late given where we're at.

6      I think we all know both sides what potential

7  constructions are going to be.  Right?  We've argued under

8  theirs all through the case.  They argued under ours all

9  through the case.  Our experts have opined on that.  So I think

10  we do know.  I think now it would just be narrowing.

11      So I would suggest, if we're going to move the trial

12  from Monday to Tuesday, we just move that date from Saturday to

13  Sunday for the exchanges.

14      MR. GREENBLUM:  Let me try to cut through this.

15      If we're going to get decisions from the Court on Monday

16  morning, how about instead of Monday evening, Monday at

17  3 o'clock?  I mean, the Court's constructions are going to

18  materially affect my opening, to be honest.

19      THE COURT:  Again, knowing what the universe of proofs

20  are, if you did your exchange on Saturday and then you just did

21  modifications after you received some rulings on Monday at

22  least so there's not a complete surprise.  I would assume that

23  there would be things that would be coming out rather than new

24  stuff going in.

25      MR. GREENBLUM:  I think that that's true with respect

1  to the '156.

2       I think it's not true with respect to constructions

3  because the constructions the Court give us are going to be

4  more than a guide to in or out.

5       They are going to be a guide to how we present evidence

6  to the Court.

7           MR. ADAMS:  Your Honor, I would say his first

8  compromise, I think, would make sense, sometime earlier on

9  Monday instead of trying to, you know, do Monday night.

10      I so think sometime earlier, maybe noon on Monday, would

11 be a better time frame than trying to wait until Monday night.

12          MR. GREENBLUM:  We are down to three hours,

13 your Honor.

14      So let's see if we can close the deal.

15          THE COURT:  It sounds like it.

16          MR. GREENBLUM:  I am not in the habit of asking the

17 Court what time it is going to issue its rulings.

18      How about we agree on, you know, within four or five

19 hours of receiving the Court's rulings on the docket?

20          MR. ADAMS:  That's great, your Honor.

21          THE COURT:  Sold.

22          MR. GREENBLUM:  Thank you, your Honor.

23          THE COURT:  Anything else with regard to our

24 housekeeping?

25          MR. ADAMS:  There is a couple of housekeeping items

1    from Cipla's standpoint.

2          The first one, I understand there was a stipulation

3    filed this morning.  Cipla wasn't served with that stipulation.

4          As I understand it, it impacts Teva and Aurobindo.

5          So, I guess, the first point I would make is we haven't

6    seen it so we don't know what's in it.  That is the first

7    point.

8          The second one, as I understand it, it is a stipulation

9    that Aurobindo will not be participating in the case, and

10   that's ordered by your Honor.

11         I understand Aurobindo had some witnesses.

12         From our perspective, those witnesses shouldn't show up

13   at trial.  We -- Cipla doesn't control them.  Their depositions

14   shouldn't be used at trial.

15         So we want to get some clarity to make sure that is what

16   occurs with respect to the Aurobindo witnesses.

17            THE COURT:  With regard to that, Counsel.

18            MR. GREENBLUM:  Just to address that, your Honor, with

19   respect to what it is, it's, as I think I described to

20   Mr. Zimmerman before Court, it's a stipulation to stay and be

21   bound.  That's not uncommon in these types of cases.

22         Essentially, Aurobindo is agreeing to live with whatever

23   judgment the Court issues with respect to the dispute between

24   Teva and Cipla.  That happens all the time.

25         I agree with Mr. Adams that they won't be participating

1    in the trial.  They won't be putting on their own argument, but

2    that's what it is.  It is fairly common, and I understood from

3    the Court's clerk that the Court would be entering that.

4          Unless the Court has questions, I can move on to the

5    second point Mr. Adams made bout witnesses.

6          THE COURT:  You can move on to the second point, and

7    then we will see what Mr. Adams has to say.

8          MR. GREENBLUM:  Sure.

9          With respect to the second point, there were depositions

10   of Aurobindo's witnesses.  There is a schedule in the pretrial

11   order for disclosure of designations of deposition testimony.

12   We will meet that schedule, and we will disclose any deposition

13   testimony that we intend to submit to the Court.

14         We do expect that that will include testimony from

15   Aurobindo witnesses.

16         Cipla was given notice of those depositions and had an

17   opportunity to cross-examine if it wished.  So I don't think

18   there will be any surprise about what's in there.

19         The Court should recall that there's no dispute in this

20   case that for infringement purposes the products of Aurobindo

21   and Cipla are the same.  So that's why witness testimony from

22   Aurobindo would come in.

23         If there's to be a dispute about the admissibility of

24   that, we're happy to meet and confer and to tee anything up for

25   the Court that we need to, but they were given notice of the

```
 1   depositions.

 2          THE COURT:  Okay.

 3          MR. ADAMS:  Your Honor, if I may respond on that

 4   second point, the notice of the deposition is one thing.

 5   There's testimony in there that has nothing to do with Cipla.

 6   It's not related to any issue in the case that's relevant if

 7   Aurobindo is out of the case.

 8          So I think from our perspective there's -- we have our

 9   witnesses.  Cipla will bring our witnesses.  They are welcome

10   to cross-examine our witnesses.  But playing deposition

11   testimony from a party who is no longer in the case just

12   doesn't make sense.

13          Certainly, it doesn't make sense in the context of

14   what's still relevant in the case and also in terms of the

15   timing and the way the case plays out.  Having additional

16   deposition testimony from a party who is no longer in the case

17   doesn't make sense.

18          MR. GREENBLUM:  If the objection is relevance, I am

19   very confident we are going to clear that threshold, but I'm

20   happy to meet and confer with Mr. Adams once we make those

21   designations in a timely fashion.  And if we still have a

22   dispute about relevance, we will tee that up to the Court.

23          THE COURT:  Perfect.

24          MR. GREENBLUM:  One other housekeeping matter,

25   your Honor, is I recall that under the local rules of the Court
```

1    there's an obligation of defendants in these types of cases to

2    regularly update their correspondence with the Food and Drug

3    Administration about their application.  And I just wanted to

4    make sure that we continue to have a complete such file from

5    Cipla as we head into trial on Tuesday.

6         MR. ADAMS:  Your Honor, I'm happy to respond to that.

7    We have.

8         There is a local rule, seven days.  We just literally

9    checked with the client.  They told us no updates.

10        I think this goes back to the point that Mr. Zimmerman

11   was making.  This is a fluid process; right?  It's not like

12   there is set product, and it's done.

13        But we have.  We checked with them, and we will continue

14   to do that and meet the local rule, seven-day requirement.

15        THE COURT:  Thank you.

16        MR. ADAMS:  And while I'm here, your Honor, I think

17   there's -- the issue of deposition, I think it is more of a

18   housekeeping question of what your preference would be, whether

19   you would prefer to have the deposition played live at trial,

20   whether you are looking for those depositions to be submitted

21   on the written record.

22        The reason I raise it, number one, is timing-wise.

23   Number 2, obviously, our experts are going to be here.  They

24   are going to want to hear what the testimony is and be able to

25   provide their opinions and view that.

1        So we're just looking for your guidance in terms of your

2   preference for how the deposition designations are handled.

3          THE COURT:  I am a little loathe to try and dictate to

4   counsel how they intend to present them.

5        I would ask that you confer to say is this going to be

6   presented via video or is this just going to be presented in

7   written form, so the Court will know as well that we will have

8   the necessary apparatus for you.

9        From my perspective, I don't have a preference one way

10  or another in terms of the testimony coming in.

11       The bigger concern is whether there's going to be any

12  objection to what's coming in.  Again, I'm going to rely on

13  counsel to meet and confer on that and just let the Court know

14  if there is going to be any issues with regard to that.

15         MR. GREENBLUM:  Understood, your Honor.

16         MR. ADAMS:  Thank you, your Honor.

17         THE COURT:  Were there any other housekeeping items

18  for defense, for Cipla?

19       Those are your items?

20         MR. ADAMS:  That was our items, your Honor.

21         MR. GREENBLUM:  No, your Honor.

22       Thank you.

23         THE COURT:  All right.

24       Tuesday's start time will be 9 o'clock.

25       We're here by 8:30, so the courtroom will be open by

1    8:30.

2        That will also give us an opportunity to confer if we

3    need to have any sort of conference before we start.  That will

4    also give us the opportunity, I don't want counsel to be overly

5    pressed because I know you're going to be speaking on Monday as

6    well with regard to different forms of testimony and other

7    things.

8        So if we need to take an opportunity to conference first

9    before we go forward, you can let us know that on Monday.  We

10   will be prepared to do that as well.

11           MR. GREENBLUM:  Thank you, your Honor.

12           MR. ADAMS:  Thank you, your Honor.

13           THE COURT:  Mr. Zimmerman.

14           MR. ZIMMERMAN:  Your Honor, just one logistical point

15   that I think would help all of the parties from planning.

16       I think everybody had planned to be here from Monday to

17   Thursday.  We're now starting on Tuesday.

18       Does the Court plan to hold Court in this matter on

19   Friday?  So that we know what our schedule looks like.  Because

20   if you tell us four days, I think we can work together to do

21   Tuesday, Wednesday, Thursday, Friday and have the trial done if

22   the Court is available.

23       I wanted to know what your schedule looked like in terms

24   of whether Friday was an available trial day?

25           THE COURT:  I believe we are available Friday.

1        Yes, we are available Friday.

2            MR. ZIMMERMAN:  Then I think counsel can get together,

3    and we can try this case in four days.

4            THE COURT:  Again, we're not going to overly force you

5    to compress your case to do it.  But if counsel feels they can

6    do that, and I think that based on what I'm seeing in the case

7    and seeing the level of preparation that was done, I would

8    think that we probably can get it done in four days.

9            In the event that we have to go further, we will.

10           MR. ZIMMERMAN:  And we appreciate the indulgence of

11   not being rushed, your Honor.  I've worked with counsel for

12   years.  We have done this many times.  It's one of those that

13   I'm very sure if we work together, we will present an orderly

14   trial to get this done in the four-day period.

15           THE COURT:  Monday, we will have a 10 o'clock start

16   time on Monday.

17           You are starting on Tuesday.

18           We will let you know when the opinions are available on

19   Monday once they are filed electronically.

20           MR. GREENBLUM:  Thank you, your Honor.

21           MR. ADAMS:  Thank you, your Honor.

22           MR. GREENBLUM:  In other words, you don't need us here

23   at 10:00 a.m. on Monday?  We will just wait until we hear from

24   the Court.

25           THE COURT:  No, I don't need you Monday.

*United States District Court*
*District of New Jersey*

1    Was there anything else?

2         MR. GREENBLUM:  No.  We appreciate the Court's time

3    today.

4         MR. ADAMS:  Nothing else, your Honor.

5         THE COURT:  I appreciate your time as well and the

6    preparation and your offers to have further discussion so that

7    we can make sure that we streamline things as much as we can.

8    Thank you both.

9    Thank you all, rather.

10        THE COURTROOM DEPUTY:  All rise.

11   (Whereupon the proceedings are adjourned at 11:22 a.m.)

12                    *         *         *

13              FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE

14

15        I certify that the foregoing is a correct transcript

16   from the record of proceedings in the above-entitled matter.

17

18   /S/ Melissa A. Mormile RDR, CCR, CRCR        11/10/2022

19   Official Court Reporter                      Date

20

21

22

23

24

25